## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DANIEL LEWIS LEE**                    :
**Register Number 21303-009**           :
**U.S. Penitentiary Terre Haute**       :
**Terre Haute, IN 47802**               :
                                        :
       **Plaintiff,**           :
                                        :
       **v.**                   :   **Case Number _____**
                                        :
**WILLIAM P. BARR**                     :
**U.S. Department of Justice**          :
**950 Pennsylvania Avenue, NW**         :
**Washington, DC 20530;**               :
                                        :
**UTTAM DHILLON**                       :
**Acting Administrator**                :
**U.S. Drug Enforcement Administration** :
**2401 Jefferson Davis Highway**        :
**Alexandria, VA 22301**                :
                                        :
**KATHLEEN HAWK SAWYER**                :
**Acting Director**                     :
**Federal Bureau of Prisons**           :
**U.S. Department of Justice**          :
**320 First St., NW**                   :
**Washington, DC 20534;**               :
                                        :
**JEFFREY E. KRUEGER**                  :
**Regional Director**                   :
**Federal Bureau of Prisons**           :
**North Central Region**                :
**U.S. Department of Justice**          :
**400 State Avenue, Suite 800**         :
**Kansas City, KS 66101;**              :
                                        :
**JOSEPH McCLAIN**                      :
**United States Marshal**               :
**Southern District of Indiana**        :
**U.S. Courthouse**                     :
**46 E. Ohio Street, Room 179**         :
**Indianapolis, IN 46204;**             :
                                        :

1

**RADM CHRIS A. BINA**                    :
**Acting Assistant Director**            :
**Health Services Division**             :
**Federal Bureau of Prisons**            :
**320 First St., NW**                    :
**Washington, DC 20534;**                :
                                         :
**T.J. WATSON**                          :
**Complex Warden**                       :
**U.S. Penitentiary Terre Haute**        :
**4700 Bureau Road South**               :
**Terre Haute, IN 47802;**               :
                                         :
**WILLIAM E. WILSON, M.D.**              :
**Clinical Director**                    :
**U.S. Penitentiary Terre Haute**        :
**4700 Bureau Road South**               :
**Terre Haute, IN 47802;**               :
                                         :
**and**                                  :
                                         :
**JOHN DOES I-X,**                       :
                                         :
**Individually**                         :
**and in their official capacities,**    :
                                         :
          **Defendants.**                :

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE FIRST, FIFTH, SIXTH AND EIGHTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND THE ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 551 *et seq.*

**I.**
**Nature of Action**

1.     Plaintiff Daniel Lewis Lee ("Lee") brings this action for injunctive and declaratory relief for (i) violations and threatened violations of his right to due process under the Fifth Amendment of the U.S. Constitution; (ii) violations and threatened violations of his right to be free from cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution; (iii) violations and threatened violations of his right to access to counsel under the

First, Fifth and Sixth Amendments of the Constitution; and (iv) violations and threatened violations of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (the "APA").

2.       Lee has been sentenced to death under federal law, and he was recently informed that his execution date is December 9, 2019.  The Defendants include the individuals who are charged with carrying out Lee's death sentence.  The United States Department of Justice (the "DOJ") announced on July 25, 2019 that Lee's execution — as well as the execution of four other federal prisoners — will be implemented through a new lethal injection protocol (the "2019 Protocol") for the Federal Bureau of Prisons (the "BOP") that replaces the prior three-drug combination with a single drug: sodium pentobarbital ("pentobarbital").[1]

3.       As alleged in more detail below, the 2019 Protocol violates Lee's constitutional rights and the APA.  Accordingly, Lee has filed this Complaint as soon as was practicable following the announcement of his execution under the 2019 Protocol.  Through this action, Lee seeks (i) a preliminary and permanent injunction preventing the implementation of the newly announced protocol; (ii) an order declaring that the 2019 Protocol violates the First, Fifth, Sixth and Eighth Amendments of the U.S. Constitution and the APA; and (iii) such other equitable relief as this Court deems just and proper.

4.       The Due Process Clause in the Fifth Amendment requires notice and the opportunity to be heard before the procedure for Lee's execution is determined, but there was no such notice or opportunity prior to the DOJ's announcement of the 2019 Protocol.  Lee, therefore, did not have the opportunity to raise questions, concerns or issues about the 2019 Protocol or otherwise participate, through counsel, in the development of the new protocol as part of the rule-making process (which was not followed here).  In addition, Lee was (and still is)

---

[1]       As described below, the 2019 Protocol is an addendum to an earlier protocol from 2004, which in turn was amended in 2008 to add the three-drug combination.

prevented from specifying all of the ways that the new procedures violate the Eighth Amendment and from consulting with medical and other experts concerning those violations.

5.      The 2019 Protocol is the result of *ultra vires* agency action in violation of the APA and the U.S. Constitution.  Lee was sentenced to death under the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591 *et seq*.  The FDPA, however, does not authorize the DOJ or BOP to create an execution protocol, set execution dates or perform the executions of prisoners sentenced under the statute.  The DOJ and BOP, therefore, lack the authority under the FDPA to conduct Lee's execution pursuant to the 2019 Protocol unless and until Congress gives the agencies such authority.  Moreover, the DOJ's and BOP's attempt to ignore or rewrite the FDPA through the 2019 Protocol is a violation of the Take Care Clause of the U.S. Constitution and its underlying principles of separation of powers.

6.      The 2019 Protocol violates the APA in three additional ways.  *First*, in developing the 2019 Protocol, the DOJ and BOP failed to follow the rule-making and other procedures required by the APA.  *Second*, the DOJ and BOP did not provide any explanation for the 2019 Protocol.  This failure demonstrates that the 2019 Protocol was not the result of reasoned decision-making and thus it constitutes "arbitrary and capricious" agency action in violation of the APA.  *Third*, the BOP lacks the authority to use pentobarbital in executions because the Controlled Substances Act ("CSA") only permits the dispensing of such a controlled substance through the issuance of a prescription by a registered practitioner, which will not take place under the 2019 Protocol.

7.      For the reasons set forth above, the 2019 Protocol must be held unlawful and set aside because it was issued without authority and otherwise violates the procedural requirements

of the APA and due process under the Fifth Amendment.  These are threshold issues.  But the substance of the 2019 Protocol also violates several of Lee's constitutional rights.

8.      The violations of the Eighth Amendment here are clear.  A method of execution violates the Eighth Amendment if it presents a "substantial risk of serious harm."  *Baze v. Rees*, 553 U.S. 35, 50 (2008).  *See also Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion) (holding that the Eighth Amendment prohibits the "unnecessary and wanton infliction of pain"); *Furman v. Georgia*, 408 U.S. 238, 273 (1972) (holding that imposition of death penalty in cases before it constituted cruel and unusual punishment).  The Eighth Amendment also forbids "deliberate indifference" to a prisoner's medical needs, which includes intentional mistreatment that is likely to seriously aggravate the prisoner's condition.  The 2019 Protocol presents a substantial risk of serious harm and evidences such a deliberate indifference.

9.      Lee has alleged below several alternatives regarding the foregoing Eighth Amendment issues.  These alternatives are feasible and available, and they significantly reduce the substantial risk of harm posed by the 2019 Protocol.

10.      The 2019 Protocol also violates Lee's right, under the First, Fifth and Sixth Amendments of the U.S. Constitution, to access to counsel during the execution because there is no provision for such access in the 2019 Protocol (or the earlier protocol).

11.      The claims in this Complaint are cognizable under the constitutional and statutory grounds identified above and described in more detail below.  This action is not, and should not be treated as, a successor habeas corpus petition.  Lee does not challenge the validity of his conviction or death sentence through this action.  Instead, he is asserting that the 2019 Protocol by which his scheduled execution is to be implemented violates the U.S. Constitution, the APA and other applicable laws.

## II.
## Parties

12.     Lee is a U.S. citizen and he is incarcerated at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute").  Lee is a death-sentenced prisoner under the control and supervision of the BOP, an agency within the DOJ.  If his capital conviction and/or death sentence are not overturned in another judicial proceeding or through executive clemency, Lee will face execution at USP Terre Haute on December 9, 2019 unless the Court grants the injunctive relief sought in this action.

13.     Defendant William P. Barr ("Attorney General Barr") is the Attorney General of the United States.   Lee was remanded into Attorney General Barr's custody upon Lee's conviction and the imposition of his death sentence.  Under the FDPA, Attorney General Barr is the executive responsible for carrying out sentences of death against federal prisoners.  He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

14.     Defendant Uttam Dhillon ("Dhillon") is the Acting Administrator of the U.S. Drug Enforcement Agency ("DEA").  In that role, he is responsible for overseeing all controlled substances, which includes pentobarbital (a Schedule II drug under the CSA).  Dhillon is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

15.     Defendant Kathleen Hawk Sawyer ("Hawk Sawyer") is the Acting Director of the BOP.[2]  As such, she is charged with prescribing and directing the promulgation of rules and regulations for the BOP, including the rules and regulations for the conduct of prison operations

---

[2]     Hawk Sawyer was appointed as the Acting Director of the BOP on August 19, 2019, replacing Hugh J. Hurwitz, due to concerns about the BOP's oversight of federal facilities. There is no requirement of U.S. Senate confirmation of the BOP director, although, in 2015, Senator Mitchell McConnell co-sponsored legislation requiring such confirmation in order to bring "much needed accountability and transparency to the BOP."

and executions.  Hawk Sawyer is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

16.     Defendant Jeffrey E. Krueger ("Krueger") is the Regional Director of the North Central Region of the BOP.  As such, he has the responsibility for USP Terre Haute, and he plays a critical role in the promulgation of rules and regulations for that prison, including the rules and regulations for the conduct of prison operations and executions.  Krueger is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

17.     Defendant Joseph McClain ("McClain") is the U.S. Marshal for the Southern District of Indiana.  In that position, he directs the personnel who administer the lethal substance(s) during executions.  McClain is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

18.     Defendant Rear Admiral Chris A. Bina ("Bina") is the Acting Assistant Director, Health Services Division, of the BOP.  In that position, he is responsible for overseeing the provision of medical care to prisoners at all BOP facilities, and for promulgating and implementing BOP policy with respect to medical care provided by the BOP.  Bina is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

19.     Defendant T.J. Watson ("Watson") is the Complex Warden of USP Terre Haute, which is where Lee is confined and at which the current BOP protocol specifies federal death sentences are to be carried out.  In that position, he is charged with management of USP Terre Haute and the oversight and implementation of operations there, including the oversight and implementation of executions at the prison.  Watson is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

20.     Defendant William E. Wilson, M.D. ("Wilson") is the Clinical Director at USP Terre Haute.  In that position, he is responsible for overseeing the provision of medical care to prisoners at that facility.  Wilson is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

21.     The Defendants identified in Paragraphs 15,16 and 18-20 above will be referred to below as the "BOP Defendants."

22.     John Does I-X are employed or retained by the BOP to consult with, prepare for and/or carry out Lee's execution.  Lee does not know, and the Attorney General and the BOP Defendants have not revealed, their identities or positions.  They are sued here in their official capacities for the purpose of obtaining declaratory and injunctive relief.

23.     Defendants are acting, and each of them at all times relevant hereto were acting, in their respective official capacities with respect to all acts described herein, and were in each instance acting under the color and authority of federal law.  Upon information and belief, unless preliminarily and permanently enjoined, each of the Defendants intends to act in his or her official capacity and under the authority of federal law in executing Lee, in violation of Lee's constitutional and/or statutory rights.

## III.
## Jurisdiction and Venue

24.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1334 because (i) it arises under the Constitution and the laws of the United States; (ii) it seeks to secure prospective, equitable relief directly under the First, Fifth, Sixth and Eighth Amendments of the Constitution; (iii) one purpose of this action is to secure declaratory relief under 28 U.S.C. § 2201(a); and (iv) one purpose of this action is to secure preliminary and permanent injunctive

relief under 28 U.S.C. § 2202.  Judicial review of the agency action at issue is also authorized by the APA, 5 U.S.C. §§ 702, 704 and 706.

25.     This Court has venue under 28 U.S.C. § 1391(b)(2) because the BOP headquarters is in this District and a substantial part of the events giving rise to the claims made by Lee — including the formulation of the BOP lethal injection procedures that are at issue here — took place and continue to take place in this District.

## IV.
## Factual Background

I.     **Lee's Conviction History and Post-Conviction Motions**

26.     In May 1999, Lee was convicted of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. §§ 1962(c) and (d), and of three murders in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1).  Lee's co-defendant, Chevie Kehoe ("Kehoe") was also convicted under the same statutes.

27.     Following separate sentencing hearings, the jury sentenced Kehoe to life without possibility of release for each of the three murders, but, despite Kehoe's indisputably greater role in the offense (as set out by the Government) the jury sentenced Lee to death.[3]  In 2000, Lee successfully moved for a new sentencing phase trial before the Arkansas District Court on the basis of an evidentiary error, but the United States Court of Appeals for the Eighth Circuit

---

[3]     Because of Lee's substantially lesser role, during the Kehoe sentencing hearing (which came first), the Eastern District of Arkansas prosecutors announced their intention to drop the death penalty against Lee should Kehoe receive a sentence of life imprisonment. The prosecutors polled all the interested parties, including the family of the victims, the case agents, and local authorities, who were in agreement.  Despite this determination, after the jury returned a life verdict for Kehoe, officials at the DOJ directed the Arkansas prosecution team to continue pursuit of the death penalty against Lee.

reversed and reinstated Lee's death sentence.  *See United States v. Lee*, 274 F.3d 485 (8th Cir. 2001).[4]

28.     On remand, the Honorable G. Thomas Eisele of the United States District Court for the Eastern District of Arkansas (the "Arkansas District Court") imposed a sentence of death on Lee, pursuant to the FDPA, on May 13, 2002.

29.     Lee thereafter appealed directly from his conviction and death sentence.  The Eighth Circuit affirmed Lee's conviction and sentence in 2004.  *See United States v. Lee*, 374 F.3d 637 (8th Cir. 2004).  Lee timely filed a petition for writ of certiorari to the United States Supreme Court and it was denied on June 27, 2005.  *Lee v. United States*, 125 S. Ct. 2962 (2005).

30.     On June 26, 2006, Lee timely filed a motion for post-conviction relief pursuant to 28 U.S.C. § 2255.  Although, among other things, Lee demonstrated through DNA testing that a hair the Government said was his (so as to connect him to the offense) did not in fact belong to him, the Arkansas District Court denied relief in August 2008.  *United States v. Lee*, No. 4:97CR00243–02 JLH, Civil No. 4:06-CV-1608, 2008 WL 4079315 (E.D. Ark. Aug. 28, 2008).  In April 2013, the Eighth Circuit affirmed the lower court's ruling, *United States v. Lee*, 715 F.3d 215 (8th Cir. 2013), and the United States Supreme Court denied Lee's petition for a writ of certiorari in October 2014.  *Lee v. United States*, 135 S. Ct. 72 (2014).

31.     In September 2013, represented by new counsel, Lee filed a motion, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, for relief from (1) the August 2008 denial of post-conviction relief pursuant to 28 U.S.C. § 2255; and (2) a December 2010 judgment denying Lee's motion to alter or amend judgment.  The motion was based on a change in the law

---

[4]     A second ground for relief dealing with the DOJ's rejection of the decision to drop the death penalty was also reversed.

allowing Lee to raise the failures of prior counsel to challenge junk science that was used against him at sentencing and had since been disavowed by the Government's expert. After the Rule 60(b) motion was denied by the Arkansas District Court in March 2014, *United States v. Lee*, No. 4:97CR00243–02 JLH, 2014 WL 1093197 (E.D. Ark. Mar. 18, 2014), Lee appealed to the Eighth Circuit.

32.     The Eighth Circuit affirmed the ruling of the Arkansas District Court in July 2015, *United States v. Lee*, 792 F.3d 1021 (8th Cir. 2015), holding that the change in the law did not apply to federal prisoners. The United States Supreme Court denied Lee's petition for a writ of certiorari in April 2017. *Lee v. United States*, 137 S. Ct. 1577 (2017).

33.     In September 2018, Lee filed a motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255 or, in the alternative, for relief from judgment under Rule 60(b), raising, among other issues, the Government's false claim that Lee had committed a prior murder as a teenager. That motion was denied by the Arkansas District Court in February 2019 as prohibited by Section 2255(h) of the Anti-Terrorism and Effective Death Penalty Act. *See United States v. Lee*, No. 4:97CR00243-02 JLH (E.D. Ark.) (Dkt. #1313).

34.     On July 5, 2019, Lee filed a Notice of Appeal from the February 2019 denial of his motion, and that appeal is currently pending before the Eighth Circuit.

## II.     The BOP Lethal Injection Protocol as of 2008

35.     Upon information and belief, there was a "BOP Execution Protocol" from 2004 (the "2004 Protocol"), which was updated through an "Addendum to BOP Execution Protocol" effective August 1, 2008 (the "2008 Addendum"). (True and correct copies of the 2004 Protocol and the 2008 Addendum are annexed hereto as **Exhibit A** and **Exhibit B**, respectively.) The 2004 Protocol and the 2008 Addendum are referred to below collectively as the "2008 Protocol."

36.     The 2008 Addendum called for the use of three drugs: (1) sodium pentothal; (2) pancuronium bromide; and (3) potassium chloride.  Other relevant aspects of the 2008 Protocol are discussed below.  (*See infra*, Section X.)

### III.     Challenges to the 2008 Protocol

37.     Prior to the recent issuance of a new lethal injection protocol, Lee was aware of various actions that federal prisoners had filed challenging the 2008 Protocol.

38.     In May 2011, however, the BOP announced that it lacked the drugs necessary to implement the 2008 Protocol and was considering revisions.  (*See* Joint Motion, dated May 24, 2011 (Dkt. #286), in *Roane et al. v. Holder et al.*, Civ. Action No. 05-2337 (D.D.C) (the "*Roane* Action").)  Thereafter, the BOP began submitting status reports in the lethal injection cases stating that the protocol revision was ongoing.  (*See, e.g.*, Status Report, dated September 1, 2011 (Dkt. #289), in *Roane* Action.)  Until recently, the BOP continued to file similar status reports regarding its continuing review of the 2008 Protocol.  (*See, e.g.*, Status Report, dated May 1, 2019 (Dkt. #383), in *Roane* Action.)

39.     Lee, therefore, did not file an action earlier challenging the lethal injection protocol because, for the past eight years, the BOP has not had an operative execution protocol. It has been unclear if — or when — revisions to the BOP lethal injection protocol would be made and, if so, what they would entail.

### IV.     Recent Announcement of Upcoming Execution Date and 2019 Addendum to 2008 Protocol

40.     The DOJ issued a press release on July 25, 2019 stating that Lee is currently scheduled to be executed at the USP Terre Haute on December 9, 2019.  (*See* https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse.)

41.     On that same day, the DOJ also announced that, at the direction of Attorney General Barr, the BOP had adopted the 2019 Protocol amending the 2008 Protocol.  (*See id.*) The DOJ and BOP refer to the 2019 Protocol as merely an "addendum," but, in fact, it seeks to effect significant changes to the 2008 Protocol.  As described below, the 2019 Protocol replaces the three-drug procedure previously used under the 2008 Protocol with a single drug — pentobarbital.  (A true and correct copy of the 2019 Protocol annexed hereto as **Exhibit C**.)

42.     By letter dated July 25, 2019 (the "July 25, 2019 Letter") and handed to him by the warden at USP Terre Haute, the BOP advised Lee of his December 9, 2019 execution date.  (A true and correct copy of the July 25, 2019 Letter is annexed hereto as **Exhibit D**.)

43.     In the July 25, 2019 Letter, the BOP states that Lee's execution will be carried out pursuant to 28 C.F.R. 26.3(a)(1) and that the letter constitutes "official notification" of the execution date and method.[5]  However, the regulations invoked by the BOP also state that, when a criminal defendant is sentenced to death, the Government "shall promptly file with the sentencing court a proposed Judgment and Order" setting forth various details regarding the execution.  28 C.F.R. 26.2(a) (emphasis added).  Lee was sentenced to death in May 2002, but, upon information and belief, the Government did not file a proposed "Judgment and Order" regarding Lee's execution with Arkansas District Court, as mandated by 28 C.F.R. 26.2(a).  The July 25, 2019 Letter and the July 31, 2019 Letter do not cure this deficiency because (a) they were not timely; and (b) they were not filed with the Arkansas District Court.

---

[5]     The July 25, 2019 Letter stated the wrong date and judge for the original judgment imposing Lee's death sentence.  The BOP re-issued the letter on July 31, 2019 (the "July 31, 2019 Letter") to correct those errors after Lee's counsel pointed them out.  (A true and correct copy of the July 31, 2019 Letter is annexed hereto as **Exhibit E**.)  Both letters failed to provide any details about the protocol, other than that the execution will be by lethal injection.

44.     As alleged below, 28 C.F.R. Part 26 does not apply to death sentences imposed under the FDPA.  If, however, there is a later determination that 28 C.F.R. Part 26 does apply to Lee's execution, the execution could not go forward under that regulation because the DOJ and BOP have failed to comply with its notice requirements.

**V.     The BOP Grievance Process and Research on Challenge to 2019 Protocol**

45.     Immediately upon learning about Lee's execution date and the 2019 Protocol, Lee's counsel (a) began working on Lee's BOP grievance for purposes of exhausting his administrative remedies regarding the relevant issues; and (b) began researching whether (and how) Lee could challenge the 2019 Protocol.  These tasks are fact-intensive and time-consuming, requiring several in-person meetings with Lee in Indiana and other detailed investigation (including factual research on the 2019 Protocol and legal research).

46.     On August 6, 2019, Lee timely filed a BP-8 form and supplement requesting an informal resolution of the identified issues, including (a) whether the 2019 Protocol constitutes a violation of the Fifth and Eighth Amendments to the U.S. Constitution; and (b) whether the 2019 Protocol is invalid because it was created in violation of the APA and is not authorized by any act of Congress.  (True and correct copies of the filed BP-8 form and supplement are annexed hereto as collective **Exhibit F**.)

47.     The BP-8 has been denied and Lee recently submitted a BP-9 to the Warden of USP Terre Haute.  Lee will continue to follow the grievance procedure, which involves the filing of a BP-10 with the North Central Regional Office and then the filing of a BP-11 with the Central Office.

48.     Given the time limits provided for responses by the respective BOP officials (with the available extensions), the end of the grievance process could be <u>after</u> Lee's December 9,

2019 execution date.  Accordingly, Lee was forced to file this action now and will exhaust his administrative remedies as they become available.

## VI.   Provisions of FDPA for Implementation of Death Sentences

49.     Section 3594 of the FDPA, 18 U.S.C. § 3594, provides for death sentences for offenses described in Section 3591, 18 U.S.C. § 3591, and it is the specific provision under which the Arkansas District Court sentenced Lee to death.

50.     Section 3596 governs the implementation of death sentences under the FDPA.  *See* 18 U.S.C. § 3596.  It states as follows:

> When the [death] sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed.  If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

18 U.S.C. § 3596(a).

51.     Thus, Section 3596 does not authorize the DOJ or BOP to create a protocol for all federal executions under the FDPA.  The 2019 Protocol, therefore, contravenes Congressional intent insofar as it prescribes the manner for executing all prisoners, like Lee, who are sentenced to death under the FDPA.

## VII.   Proposed Implementation of Lee's Death Sentence under the 2019 Protocol

52.     The 2019 Protocol does not refer anywhere to the FDPA or the implementation requirements in Section 3596.  Instead, the sole authority cited by the DOJ in the 2019 Protocol is 28 C.F.R. 26.3(a), which states that death sentences shall be executed (i) at the time and place designated by the Director of the BOP; (ii) at a federal penal or correctional institution; and (iii)

by injection of a lethal substance or substances under the direction of the U.S. Marshal.  The July 25, 2019 Letter and July 31, 2019 Letter also identify 28 C.F.R. 26.3(a) as the authority for Lee's execution.

53.     By invoking 28 C.F.R. 26.3(a), the DOJ and BOP are attempting to establish a protocol covering all executions under the FDPA.  This action, however, is directly contrary to the requirements in Section 3596 of the FDPA and, accordingly, it cannot be undertaken without authorization from Congress.

### VIII.   The DOJ and BOP Have Recognized That They Lack Authority to Implement Sentences under the FDPA Through Protocols Like the 2019 Protocol

54.     The legislative history of proposed amendments to the FDPA confirms that the DOJ and BOP cannot rewrite the statute by seeking to implement a protocol in contravention of the FDPA's mandates.  Indeed, soon after the FDPA was passed in 1994, the DOJ apparently realized that the implementation provisions in Section 3596 are at odds with 28 C.F.R. 26.3.

55.     In the very next legislative session (in 1995), Rep. William McCollum introduced H.R. 2359, which sought to amend Section 3596(a) so that it would read as follows:

> "A person who is sentenced to death shall be committed to the custody of the Attorney General.  At the time the sentence is to be carried out, it shall be implemented pursuant to the regulations prescribed by the Attorney General."

Thus, the amended Section 3596(a) would have explicitly given the DOJ authority to create an execution protocol and carry out executions of prisoners sentenced under the FDPA by removing the requirement that such federal executions follow the procedures of the state where the sentence was imposed.

56.     Rep. McCollum specifically referred to this issue in introducing the bill.  He noted that, under the existing version of the FDPA, the implementation of the death sentence must be in the manner prescribed by the state where the sentence was imposed.  (Hearing Before

the Subcommittee on Crime of the House Committee on the Judiciary (104th Congress), Sept. 28, 1995 ("Subcommittee Hearing Tr.") at 2.)   Rep. McCollum also stated that, under the proposed amendment, the Attorney General would prescribe the manner for all federal executions.  (*Id.*)

57.     Various DOJ officials provided written and oral testimony to the same effect. (*See id.* at 33-34, 37-38, 46, 149-50.)   Hawk Sawyer (then Kathleen M. Hawk), who was the BOP director in 1995 and was recently named as the Acting Director of the BOP, provided a written statement in support of the amendment that largely tracked the statement of her DOJ colleagues.[6]

58.     After the hearing before the Subcommittee on Crime, Congress took no further action on the proposed amendment to the FDPA in H.R. 2359.

59.     Since 1995, there have been eight other attempts by Congress to amend Section 3596, all in an apparent effort to allow the BOP to carry out executions under its own procedures as opposed to those of the state where the sentence was imposed.  Congress did not pass any of those amendments.[7]

---

[6]     Hawk Sawyer noted that, under the existing law, the only executions affected by the FDPA that could occur at USP Terre Haute "are those for which lethal injection was permissible in the State in which the inmate was convicted" and in the manner prescribed by the law of such state.  (*See* Congressional Testimony of Kathleen M. Hawk, Subcommittee on Crime of the House Committee on the Judiciary, June 8, 1995, 1995 WL 352705.)  However, it is not clear the FDPA does allow for such executions to take place at Terre Haute, but rather that prisoners sentenced to death pursuant to the FDPA are to be released to the custody of a U.S. Marshal for execution.

[7]     There are other conflicts between Section 3596 of the FDPA and the 2019 Protocol.  The latter states that the director of the BOP will appoint a senior-level BOP employee to "supervise the activities of personnel preparing and administering the lethal substances."  (Ex. C, ¶ E.) Section 3596, however, provides that the U.S. Marshal "shall supervise implementation of the sentences."

## IX. The BOP's Failure to Provide Information Regarding the Development of the 2019 Protocol and to Allow for Public Participation in the Process

60.     As alleged above, the DOJ and BOP stated more than eight years ago that the government was working on certain revisions to the lethal injection protocol.  However, between the time of the 2011 announcement and the recent announcement of the 2019 Protocol, the DOJ and BOP did not provide any public information about the revisions and the development of the 2019 Protocol or an explanation of the new protocol.

61.     The DOJ and BOP also did not engage in the requisite rule-making process under the APA, which requires an agency to publish proposed rules in advance of adoption and allows the public an opportunity to comment on such policy changes before they are put into place. Instead, the revisions to the 2019 Protocol have been shrouded in secrecy.

62.     The lack of transparency surrounding the 2019 Protocol prompted the Committee on Oversight and Reform of U.S. House of Representatives to write to Attorney General Barr and the then-Acting Director of the BOP on August 14, 2019, requesting information and documents regarding the 2019 Protocol.  (*See* letters from Reps. Jamie Raskin and Ayanna Pressley, true and correct copies of which are annexed hereto as **Exhibit G** and **Exhibit H**.)

63.     Also, in connection with rule-making activities, agencies will often gather information known as the "Administrative Record."  Upon information and belief, there is an Administrative Record relating to the 2019 Protocol.  To date, the DOJ and BOP have not made the Administrative Record available to the public.

64.     Lee is entitled to this (and other) information regarding the 2019 Protocol, which is in the sole possession of the DOJ and BOP.  Lee will seek such information through the discovery process in this case.

## X.    Lethal Injections under the 2019 Protocol

### A.    Inconsistencies Between the 2008 Protocol and 2019 Protocol

65.    The 2019 Protocol is styled as an "addendum" to the 2008 Protocol, which implies a consistency between the two documents.  As alleged below, however, there are several material inconsistences between the 2008 Protocol and the 2019 Protocol.

66.    For example, the 2019 Protocol provides that the final selection of the execution team members (not less than 14 days before the execution) will be made by the director of the BOP (or his/her designee), in conjunction with U.S. Marshal.  (*See* Ex. C, ¶ D.)  The 2008 Protocol, however, repeatedly states that the Warden has responsibility for selecting the execution team and related matters.  (*See* Ex. A, Chapter 1, §§ III (F), IV (B) and IV (E).)

67.    Similarly (and as noted above), the 2019 Protocol states that the BOP director shall appoint a senior-level BOP employee to "supervise the activities of personnel preparing and administering the lethal substances."  (Ex. C, ¶ E.)  The 2008 Protocol, by contrast, gives extensive supervisory responsibility to the Warden.  (*See* Ex. A, Chapter 1, §§ III-VII.)

68.    Under the circumstances, Lee has no notice (or inadequate notice) as to which of the various provisions controls and how he is to be executed.  These complaints are not merely academic.  For a prisoner, like Lee, who has been notified to anticipate an execution date in a few short months, knowing who will select execution team members and supervise the administration of lethal substances takes on immediate and substantial significance, in part due to the drug administration and related concerns detailed below

### B.    Issues with Pentobarbital

69.    Pentobarbital is a barbiturate that affects the activity of the brain and nervous system.  It is clinically indicated for use as a pre-anesthetic, a sedative, and for treatment of brain-swelling, seizures and insomnia.  According to the expert testimony of William Ebling,

19

Ph.D., in *Ayala et al. v. Davis et al.*, Case 3:06-cv-00219-RS (N.D. Cal.), pentobarbital can cause an individual to be in a "never-never land in between wakefulness and sleep with an obstructed airway bubbling away … and with all kinds of secretions … it's not pretty." (Fifth Am. Compl., dated Feb. 27, 2019, Dkt. #710, ¶ 223.)

70.     Pentobarbital has an alkaline pH that is significantly higher than normal blood pH.  Therefore, if it is inadvertently injected into tissue other than a vein (such as by insufficiently trained personnel), pentobarbital causes tissue damage and severe pain.

71.     The high pH level of pentobarbital also leads to pulmonary edema.  Autopsies performed of prisoners who were executed through the single-drug use of pentobarbital have confirmed the presence of pulmonary edema.

72.     Pulmonary edema is extremely painful and, a leading expert, Dr. Mark Edgar, has described it as follows:

> Pulmonary edema has a variety of effects on the body.  First, the presence of fluid in airspaces (alveolar sacs) interferes with normal gas exchange, which reduces the amount of oxygen in the blood.  It also increases the work of breathing; in mild cases, this causes shortness of breath, sometimes coughing or wheezing, and increase in the rate of breathing, but with increasing severity it greatly increases the work of breathing such that the chest muscles and diaphragm strain as they expend greater effort to move air into the lungs.  This also produces sensations similar to drowning or asphyxiation as fluid occupies a greater volume of the air spaces.  Severe pulmonary edema is an intolerable state that produces panic and terror.

(*In re Ohio Execution Protocol Litig.*, 2:11-cv-1016 (S.D. Ohio) (the "*Ohio Protocol* Action"), Expert Report of Dr. Mark Edgar, Dkt. # 2035-1, ¶ 12.)[8]

---

[8]     The court in the *Ohio Protocol* Action accepted Dr. Edgar's testimony, finding that "pulmonary edema itself certainly or very likely causes severe pain and needless suffering." (Decision and Order on Motion for Stay of Execution and Prelim. Inj., dated Jan. 14, 2019, Dkt. # 2133, at 131.)

73.   Because pulmonary edema may develop suddenly, there is a substantial risk of severe pain either before the pentobarbital renders the recipient insensate or if the full dose of pentobarbital is not administered or is administered improperly.

74.   The DOJ and BOP have not revealed how the pentobarbital to be used under the 2019 Protocol will be obtained, and they should be required to do so.  Additionally, the 2019 Protocol provides no specific information about the pentobarbital the DOJ and BOP intend to use in executions, beyond the fact that the drug is pentobarbital, and that five grams will be administered through an IV.  The 2019 Protocol does not specify whether the pentobarbital must be an FDA-approved version of the drug, or if it can instead be a compounded or imported version of the drug.  It does not say whether the drug will be tested to ensure identity, purity and potency and, if so, at what interval.  As such, Lee has no guarantee that the drug intended to be used in his execution will be effective, much less if it actually will be pentobarbital.

75.   Upon information and belief, there are four pharmaceutical companies that manufacture FDA-approved pentobarbital products that are administered by IV.  These companies have made clear that they do not want their pentobarbital products used in executions and have asserted their rights to refuse to sell their products for such use.  To be sure, states continue to carry out executions using pentobarbital, but, upon information and belief, states that currently use pentobarbital in their lethal injection procedures (such as Texas, Georgia and Missouri) have resorted to versions of the drug made by, or obtained from, compounding pharmacies.

76.   The Government may use manufactured FDA-approved pentobarbital, despite the distribution restrictions, or imported pentobarbital.  Or, as is the case with some states, the Government may use versions of pentobarbital obtained from a compounding pharmacy.

77.     Compounding facilities have had well-documented problems.   Texas, for example, purchased its supply of pentobarbital from a compounding pharmacy (Greenpark) whose license was on probation for providing dangerous mixtures to children.   (*See Inmates Said the Drug Burned as They Died.  This is How Texas Gets its Execution Drugs,* Buzzfeed News (Nov. 28, 2018), www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas.)   In addition, the FDA has warned Greenpark about "serious deficiencies in [its] practices for producing sterile drug products.   (*See* FDA, *Warning Letter: Greenpark Compounding Pharmacy* (Oct. 26, 2018), www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/greenpark-compounding-pharmacy-566233-10262018.)   Similarly, Missouri purchased pentobarbital for executions from a company (Foundation Care) that, according to a report from Buzzfeed News, has been repeatedly found to engage in hazardous pharmaceutical procedures.   (*See Missouri Fought For Years To Hide Where It Got Its Execution Drugs.  Now We Know What They Were Hiding,* Buzzfeed News (Feb. 20, 2018), www.buzzfeednews.com/article/chrismcdaniel/missouri-executed-17-men-with-drugs-from-a-high-risk.)

78.     Compounded drugs are not FDA-approved, and they are subject to less rigorous regulation and oversight relating to the identity, purity and potency of the drug.   If the DOJ and BOP source pentobarbital for executions from a compounding pharmacy, there is a substantial risk that the drug will be contaminated, handled improperly or sub-potent.   (*See, e.g., Will Texas Have to Push Back the Expiration Dates on its Lethal Injection Drugs?,* Texas Tribune (May 17, 2018),   www.texastribune.org/2018/05/17/texas-lethal-injection-drugs-are-set-expire-upcoming-executions/.)   If the pentobarbital has problems with identity, purity and potency, there is a substantial risk that its use would result in painful or botched executions.   For example, five

people who were executed in Texas through the use of pentobarbital complained that they felt as if they were burning before they finally died.  (*See Inmates Said the Drug Burned as They Died. This is How Texas Gets its Execution Drugs,* Buzzfeed News (Nov. 28, 2018), www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas.)  In another instance, Georgia cancelled a 2015 execution because the compounded pentobarbital came out of suspension and was therefore unusable.  (*See Secret Sedative: How Missouri Uses Pentobarbital in Executions*, St. Louis Public Radio (Aug. 18, 2017), https://news.stlpublicradio.org/post/secret-sedative-how-missouri-uses-pentobarbital-executions#stream/0.)[9]

79.     Upon information and belief, pentobarbital imported from overseas also would not have FDA approval, and, therefore, would not carry the same assurances of identity, purity and potency as FDA-approved pentobarbital.  If the DOJ and BOP source pentobarbital for executions from overseas, there is a substantial risk that the drug will be contaminated, handled improperly or sub-potent and a substantial risk that its use would result in painful or botched executions.[10]

**C.     Issues with Setting Intravenous ("IV") Catheters**

80.     Lethal injection executions have also been plagued by difficulties with setting IVs.  The complaints in two other actions pending in this district, the *Roane* Action and *Bourgeois v. U.S. Dep't of Justice et al.*, 1:12-cv-00782-TSC (the "*Bourgeois* Action"), provide details on the issues that have arisen.

---

[9]      A "suspension" is a heterogeneous mixture in which the solute particles do not dissolve, but get suspended throughout the bulk of the solvent, left floating around freely in the medium.

[10]      The foregoing allegations were gleaned from press reports and other public information. Lee will need discovery on these issues and the other issues discussed in the Complaint.

81.     In the initial complaint in the *Bourgeois* Action (filed in 2012), the plaintiff cited

the following examples:

a.     March 13, 1985, Texas.  Because of Stephen Peter Morin's history of drug abuse, the execution technicians were forced to probe both of Morin's arms and one of his legs with needles for nearly 45 minutes before they found a suitable vein.

b.     August 20, 1986, Texas.  Randy Woolls, a drug addict, was required to help the execution technicians find a useable vein for the execution.

c.     June 24, 1987, Texas.  Because of collapsed veins, it took nearly an hour to complete the execution of Elliot Rod Johnson.

d.     January 24, 1992, Arkansas.  It took medical staff more than 50 minutes to find a suitable vein in Rickey Ray Rector's arm.  Witnesses were kept behind a drawn curtain and not permitted to view this scene, but reported hearing Rector's eight loud moans throughout the process.  During the ordeal Rector (who suffered from serious brain damage) helped the medical personnel find a vein.

e.     April 23, 1992, Texas.  Billy Wayne White was pronounced dead 47 minutes after being strapped to the execution gurney.  The delay was caused by difficulty finding a vein.  White had a long history of heroin abuse.  During the execution, White attempted to assist the authorities in finding a suitable vein.

f.     January 23, 1996, Virginia.  The execution of Richard Townes, Jr. was delayed for 22 minutes while medical personnel struggled to find a vein large enough for the needle.  After unsuccessful attempts to insert the needle through the arms, the needle was finally inserted through the top of Mr. Townes' right foot.

g.     July 18, 1996, Indiana.  Because of unusually small veins, it took one hour and nine minutes for Tommie J. Smith to be pronounced dead after the execution team began sticking needles into his body.  For sixteen minutes, the execution team failed to find adequate veins, and then a physician was called.  Smith was given a local anesthetic, and the physician twice attempted to insert the tube in Smith's neck.  When that failed, an angio-catheter was inserted in Smith's foot.  Only then were witnesses permitted to view the process.  The lethal drugs were finally injected into Smith 49 minutes after the first attempts, and it took another 20 minutes before death was pronounced.

h.      June 13, 1997, South Carolina.  Because Michael Eugene Elkins's body had become swollen from liver and spleen problems, it took nearly an hour to find a suitable vein for the insertion of the catheter.  Elkins tried to assist the executioners, asking, "Should I lean my head down a little bit?" as they probed for a vein.  After numerous failures, a usable vein was finally found in Elkins's neck.

i.      August 26, 1998, Texas.  The execution of Genaro Ruiz Camacho was delayed approximately two hours due, in part, to problems finding suitable veins in Camacho's arms.

j.      October 5, 1998, Nevada.  It took 25 minutes for the execution team to find a vein suitable for the lethal injection of Roderick Abeyta.

k.      May 3, 2000, Arkansas.  Christina Marie Riggs' execution was delayed for 18 minutes when prison staff couldn't find a suitable vein in her elbows.  Finally, Riggs agreed to the executioners' requests to have the needles in her wrists.

l.      June 8, 2000, Florida.  It took execution technicians 33 minutes to find suitable veins for the execution of Bennie Demps.  "They butchered me back there," said Demps in his final statement.  "I was in a lot of pain.  They cut me in the groin; they cut me in the leg.  I was bleeding profusely.  This is not an execution, it is murder."  The executioners had no unusual problems finding one vein, but because Florida protocol requires a second alternate intravenous drip, they continued to work to insert another needle, finally abandoning the effort after their prolonged failures.

m.      December 7, 2000, Texas.  The execution of Claude Jones, a former intravenous drug abuser, was delayed 30 minutes while the executioners struggled to insert an IV into a vein.  One member of the execution team commented, "They had to stick him about five times.  They finally put it in his leg."

n.      November 7, 2001, Georgia. Jose High was pronounced dead more than one hour after his execution began.  After attempting to find a useable vein for 39 minutes, the emergency medical technicians under contract to do the execution abandoned their efforts.  Eventually, one needle was stuck in High's hand, and a physician was called in to insert a second needle between his shoulder and neck.

o.      May 24, 2007, Ohio.  Christopher Newton.  According to the Associated Press, "prison medical staff" at the Southern Ohio Correctional Facility struggled to find veins on each of Newton's arms during the execution.  Newton, who [weighed] 265 pounds, was declared dead almost two hours after the execution process began.  The execution team stuck Newton at

least ten times with needles before getting the shunts in place where the needles are injected.

p. June 26, 2007, Georgia.  John Hightower took approximately 40 minutes for the nurses to find a suitable vein to administer the lethal chemicals, and death was not pronounced until almost an hour after the execution process began.

q. September 15, 2009, Ohio.  Romell Broom.  After two hours of searching for suitable veins to insert the needles for lethal injection, the execution team was unable to complete the process and the execution was called off. Since then, stays have been granted by courts considering whether it would be constitutional to attempt Broom's execution a second time.

(Compl. in *Bourgeois* Action, ¶ 60.)

82. Since the filing of the *Bourgeois* Action in 2012, there have been several other instances of IV problems in lethal injections.  For example, at the well-publicized Clayton Lockett execution in 2014, the femoral line was not placed correctly and he regained consciousness before dying.  (*See* https://www.nytimes.com/2014/04/30/us/oklahoma-executions.html.)  In addition, in Ohio (2017) and Alabama (2018), the personnel tried unsuccessfully for an extended period of time to set IVs in two very ill prisoners, Alva Campbell and Doyle Lee Hamm.  (*See* https://www.nbcnews.com/news/us-news/alva-campbell-inmate-who-survived-execution-try-dies-ohio-prison-n852961; https://www.nbcnews.com/storyline/lethal-injection/doyle-lee-hamm-wished-death-during-botched-execution-report-says-n853706.) Those two executions were called off as a result.[11]

83. Here, the 2019 Protocol states that the BOP Director (or his/her designee) will determine the method of IV access for an execution based on the training and experience of the

---

[11] In both Georgia and Texas executions using pentobarbital, there were also difficulties with placing IVs in the arms of inmates who had been heavy drug users.  In the case of one such execution, the team "couldn't get a vein, and what they had to do is what they call a 'cut down' where they inserted the IV at the base of his neck."  (*See Secret Sedative*, https://news.stlpublicradio.org/post/secret-sedative-how-missouri-uses-pentobarbital-executions#stream/0.)

personnel establishing the IV access, based upon a recommendation from qualified personnel or to comply with specific orders of federal courts. (Ex. C, § H.) No information is provided relating to the qualifications of the BOP Director to make this determination, the identity of these "qualified personnel" or the circumstances under which they would be present. Moreover, the protocol clearly contemplates that the training and experience of the execution team member placing the IVs can change from one execution to the next. There is no indication whether the prisoner's veins will be assessed as part of the determination of appropriate IV placement.

84.     Thus, the 2019 Protocol gives total discretion to the personnel involved in the execution, and it provides no guidelines with regard to the options and limitations for the IV placement. Can the execution team establish central line access? Can they perform a cut-down? Is there an order of preferred access sites? Is there a time limit for establishing IV access? Is there a limit on the number of times the team can attempt IV access? These critical questions are left unanswered in the 2019 Protocol.

D.     **Lack of Transparency Regarding Personnel and Procedures under the 2019 Protocol**

85.     The same lack of transparency and guidelines applies as a general matter to the personnel and procedures under the 2019 Protocol.

86.     The preparation of drugs, particularly for IV use, is a technical task requiring significant training in pharmaceutical concepts and calculations. There are many risks associated with drug preparation that, if not properly addressed by credentialed and trained personnel, further elevate the risk that a person will experience excruciating pain during lethal injection. The correct and safe management of IV drug and fluid administration requires a high level of professional acumen, and cannot be performed adequately by personnel lacking the requisite training and experience.

27

87.     Indeed, as alleged above, many of the problems relating to pentobarbital arose because of improper procedures, which illustrates the importance of well- trained and qualified personnel as well as the use of accepted, verifiable procedures.  (*See, e.g.*, Exs. G & H, at 2 ("We are extremely concerned about the types of facilities from which the [BOP] will obtain its pentobarbital, whether the [BOP] will be able to guarantee that its intended method of execution is as painless as possible, and whether the [BOP] will be subject to rigorous protocols to prevent the problems that have occurred at the state level.").)

88.     Rather than complying with the APA by supplying adequate information to Lee and the public about the 2019 Protocol or, for example, the provenance and qualities of the pentobarbital they intend to use, the DOJ and BOP have taken steps to block access to information about the personnel, procedures and lethal substance.  The 2019 Protocol, for example, states that "any documentation establishing [the] qualifications" of the personnel involved in the executions "shall be protected from disclosure to the fullest extent permitted by law."  (Ex. C, ¶ B.)  There is no legal basis cited nor any justification for refusing to disclose proof that such personnel are qualified to perform the complex tasks relating to executions.

89.     Moreover, the 2019 Protocol gives the BOP director overly broad discretion to change the procedures for implementing death sentences:

> The procedures utilized by the BOP to implement federal death sentences shall be as follows unless modified at the discretion of the Director or his/her designee, as necessary to (1) comply with specific judicial orders; (2) based on the recommendation of on-site medical personnel utilizing their clinical judgment; or (3) as may be required by other circumstances.

(*Id.*, ¶ A.)  In particular, the ability of the BOP director to make modifications "as may be required by other circumstances" is so broad as to constitute nearly unfettered discretion.

90.     While the 2019 Protocol provides some vague and high-level information, it lacks sufficient detail regarding the planned implementation of executions.  Specifically, it fails to address numerous factors that are necessary to ensure compliance with constitutional requirements, including, but not limited to, the following:

a.      the methods for obtaining, storing, mixing, and appropriately labeling the pentobarbital, the chain of custody for the pentobarbital, the minimum qualifications and expertise required for the person who will be determining the concentration and dosage to give, and the criteria that shall be used in exercising this discretion;[12]

b.      the form and provenance of the pentobarbital to be used (manufactured, FDA-approved, compounded, imported, etc.);

c.      testing of the pentobarbital at regular intervals to ensure, at a minimum, identity, purity and potency, and conveyance of test results to condemned prisoners facing execution prior to their execution;

d.      the consideration of individualized factors, including health circumstances and medical history;

e.      the manner in which the IV tubing, three-way valve, saline solution or other apparatus shall be modified or repaired in the event it malfunctions during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

f.      the manner in which a monitoring system shall be installed and utilized to ensure that the prisoner is deeply sedated while dying; and the qualifications and expertise required for the person who operates this equipment;

g.      the manner in which the IV catheters shall be inserted into the condemned prisoner, the minimum qualifications and expertise required for the person who is given the responsibility and discretion to decide when efforts at inserting the IV catheters should be abandoned in favor of some other constitutionally acceptable procedure; and the manner in which the condition of the condemned prisoner will be monitored to confirm that the protocol is not inflicting severe and unnecessary pain;

---

[12]     Rather than giving the discretion to determine the appropriate concentration and dosage, the 2019 Protocol fixes the amounts to be used in all cases.  (*See* Ex. C, ¶ H.)

h.     the minimum qualifications and expertise required of the person who is given the responsibility and discretion to order the staff to divert from the established protocols if necessary to avoid inflicting severe and unnecessary pain and suffering, and the criteria to be used in exercising this discretion; and

i.     the minimum qualifications and expertise required of the person who is given the responsibility and discretion to ensure that appropriate procedures are followed in response to unanticipated problems or events arising during the execution, and the criteria that shall be used in exercising this discretion.

## XI.   Alternatives Relating to Eighth Amendment Issues

91.     There are at least three alternatives regarding the Eighth Amendment issues raised by the 2019 Protocol.  Lee has identified the alternatives below based on available information, but Defendants have sole possession of the information regarding other potential alternatives and they should be ordered to provide it in discovery in this case.

92.     *First*, the implementation of the safeguards alleged in Paragraph 90 above presents a straightforward and available alternative to the defective 2019 Protocol.  The DOJ and BOP should incorporate these safeguards in order to ensure (1) the selection of qualified, competent and vetted team members, whose qualifications are disclosed; (2) establishment of two patent, functioning peripheral IV lines and (a) that no central line will be placed unless it is determined to be necessary following a vein assessment by a qualified medical professional and (b) central lines will be set only by qualified and competent medical professionals; (3) use of FDA-approved pentobarbital or compounded pentobarbital that (a) complies with all state and federal compounding requirements, (b) has been tested, with the records of this testing, chain of custody documentation and (c) the compounding formula disclosed to prisoners and their counsel.  Upon information and belief, these safeguards are available, are feasible, and would significantly reduce the substantial risks of harm posed by the 2019 Protocol.

93.     *Second*, the bedside administration of pentobarbital could reduce or eliminate several of the deficiencies in the 2019 Protocol.  Eliminating the need for extension sets of IV tubing can significantly reduce the risks of leakage or pinching of the tubing.  Bedside administration would also ensure adequate surveillance and monitoring of the IV, the catheter site and the prisoner.  And, by eliminating the need for lengthy IV tubing, bedside administration would greatly reduce the variation and risk introduced by the increased contact, and subsequent resistance, between the drug and the walls of the tubing.  Upon information and belief, bedside administration is available, is feasible, and would significantly reduce the substantial risks of harm posed by the 2019 Protocol.

94.     *Third*, along with incorporating safeguards and transparency into the pentobarbital protocol, the DOJ and BOP could add a pre-dose of either an opioid or an anti-anxiety medication in a large clinical dose.  This pre-treatment of the prisoner would substantially reduce the risk that the prisoner would remain sensate to experience pain, including the pain of pulmonary edema.  Upon information and belief, a pentobarbital protocol with transparency, safeguards and pre-treatment constitutes an alternative procedure that is available and feasible, and it would significantly reduce the substantial risks of harm posed by the 2019 Protocol.

### V.
### Claims for Relief

### Count I
### (Fifth Amendment Violation — Denial of Due Process)

95.     Lee realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

96.     The Due Process Clause in the Fifth Amendment requires notice and the opportunity to be heard before the deprivation of life, liberty, or property.

97.     Defendants, acting under color of federal law, have not disclosed sufficient details regarding the procedures that will be utilized in carrying out Lee's executions, preventing Lee from determining all the aspects of the 2019 Protocol that constitute cruel and unusual punishment and from consulting medical experts concerning those aspects.

98.     Moreover, the discretion given to the BOP director under the 2019 Protocol to change the death sentence implementation means that Lee will have not sufficient notice and opportunity to challenge the manner of execution.

99.     The foregoing is a violation of the Due Process Clause.

## Count II
### (Eighth Amendment Violation — Cruel and Unusual Punishment)

100.    Lee realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

101.    The Eighth Amendment forbids the Government, in carrying out a death sentence, from inflicting pain beyond that necessary to end the prisoner's life.  *In re Kemmler*, 136 U.S. 436, 447 (1890).  "Punishments are cruel when they involve torture or a lingering death … something more than the mere extinguishment of life." *Id.  See also Baze*, 553 U.S. at 50 (execution violates the Eighth Amendment if it presents a "substantial risk of serious harm").

102.    Defendants, acting under color of federal law, intend to execute Lee in a manner that is arbitrary, cruel and/or unreliable, and which will inflict excruciating pain on Lee, or has a foreseeable and significant but completely avoidable and unnecessary risk of causing such pain. Because the 2019 Protocol poses a substantial risk of serious harm to Lee, it violates Lee's constitutional right to be free from arbitrary, capricious, cruel, and unusual punishment.

103.    That right is secured and guaranteed to Lee by the Eighth Amendment to the U.S. Constitution.

104.    Lee has alleged above several alternatives to the 2019 Protocol.

## **Count III**
### **(Eighth Amendment Violation — Deliberate Indifference)**

105.    Lee realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

106.    The Eighth Amendment forbids "deliberate indifference" to "serious medical needs of prisoners," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and to a substantial risk of serious harm to a prisoner.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

107.    The BOP undertakes to provide inmates with medical care that is "presently medically necessary," which is defined as treatment "without which an inmate could not be maintained … without significant pain or discomfort."  (Fed. Bureau of Prisons, U.S. Dep't of Justice, Program Statement, No. 6000.4 (Dec. 15, 1994), Ch. 1, § 1.)

108.    The Attorney General and the BOP Defendants are required to provide Lee with appropriate medical care until the moment of his death.  Thus, the Eighth Amendment's proscription against "deliberate indifference" requires that they administer the death penalty without the "unnecessary and wanton infliction of pain."  *Gregg,* 428 U.S. at 173.

109.    However, the means chosen by the Attorney General and the BOP Defendants to execute Lee under the 2019 Protocol constitute deliberate indifference to a substantial risk of serious harm to Lee.  Thus, the 2019 Protocol violates rights secured and guaranteed by the Eighth Amendment of the U.S. Constitution.

110.    Lee has alleged above several alternatives to the 2019 Protocol.

## Count IV
### (First, Fifth and Sixth Amendment Violations — Access to Counsel)

111.    Lee realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

112.    Prisoners have a right under the First and Fifth Amendment of the U.S. Constitution to access to the courts.  *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 350-51 (1996); *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974).   They are also entitled, under the Sixth Amendment of the U.S. Constitution, to have access to counsel at all "critical" stages of criminal proceedings.  *U.S v. Wade*, 388 U.S. 218, 227-28 (1967).

113.    Prisoners have the right to appointed counsel throughout the execution procedure. *See Harbison v. Bell*, 556 U.S. 180, 194 (2009).  Moreover, prisoners are entitled to have access to such counsel in every proceeding subsequent to appointment, including during an execution. *See, e.g., In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2018 WL 6529145, at **4-5 (S.D. Ohio Dec. 12, 2018); *Cooey v. Strickland*, No. 2:4-CV-1156, 2011 WL 320166, at **5-12 (S.D. Ohio Jan. 28, 2011.)

114.    The 2019 Protocol does not provide prisoners with access to counsel during the execution.  Nor does the 2008 Protocol.  Therefore, under the 2019 Protocol, Lee could be deprived of access to counsel during the execution and would not be able to communicate with counsel regarding any problems, including constitutional violations.

115.    In addition, the protocols do not permit witnesses (including attorneys) to view the setting of IVs, so those witnesses have no way of knowing if there are issues with the IV-setting process.

116.    This deprivation of access to counsel violates the First, Fifth and Sixth Amendments of the U.S. Constitution.

## Count V
### (Violation of APA — *Ultra Vires* Agency
### Action Contrary to U.S. Constitution)

117.    Lee realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

118.    The Take Care Clause of the U.S. Constitution imposes a duty on the Executive Branch to "take care that the laws be faithfully executed."  U.S. Const., art. II, § 3.  The Take Care Clause forbids the Executive Branch from making acts of Congress unlawful by refusing to enforce them as written.  The Take Care Clause preserves the principles of separation of powers inherent in the U.S. Constitution by preventing the Executive Branch from arrogating to itself the legislative power to revoke or rewrite laws.

119.    As alleged above, the DOJ and BOP seek to rewrite the FDPA by ignoring its express requirements regarding the implementation of death sentences under the FDPA. Through the 2019 Protocol, therefore, the DOJ and BOP are violating the Take Care Clause of the U.S. Constitution and the principles of separation of powers.

120.    The APA prohibits agency actions that are "not in accordance with the law," 5 U.S.C. § 706(2)(A) or are "contrary to constitutional right, power, privilege or immunity," 5 U.S.C. § 706(2)(C).  The 2019 Protocol violates both of these provisions.

121.    This violation of the APA will cause an injury to Lee's interest because, as alleged above, an execution under the 2019 Protocol has the substantial probability of resulting in cruel and unusual punishment due to the properties of pentobarbital, the undefined and unrestricted procedures to be used in the execution or both.

122.    Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2).

## Count VI
### (Violation of the APA — *Ultra Vires* Agency
### Action Contrary to Statutory Authority)

123.   Lee realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

124.   Under the APA, a reviewing court must set aside any agency action that is "in excess of statutory jurisdiction, authority or limitations …." 5 U.S.C. § 706(2)(C).

125.   As alleged above, the 2019 Protocol violates the mandates of the FDPA.  The 2019 Protocol sets forth the manner for implementing all federal executions (including those under the FDPA), but the FDPA does not authorize the DOJ or BOP to create an execution procedure for prisoners sentenced to death under its provisions, set execution dates, or to carry out their executions.  Instead, the FDPA calls for the U.S. Marshal Service to carry out the execution in the manner prescribed by the state in which the defendant's sentence was imposed.

126.   Lee's death sentence was imposed under the FDPA, which means that the FDPA controls the manner of his execution.

127.   The DOJ and BOP have acknowledged in public testimony that the FDPA does not allow for the manner of execution set forth in the 2019 Protocol.

128.   The 2019 Protocol, therefore, constitutes *ultra vires* agency action because the DOJ and BOP lacked the authority under the FDPA to issue the 2019 Protocol.

129.   This violation of the APA will cause an injury to Lee's interest because, as alleged above, an execution under the 2019 Protocol has the substantial probability of resulting in cruel and unusual punishment due to the properties of pentobarbital, the undefined and unrestricted procedures to be used in the execution or both.

130.   Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2).

## Count VII
### (Violation of the APA — Violation of
### Notice-and-Comment Rulemaking)

131.    Lee realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

132.    The APA requires a reviewing court to set aside any agency action taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

133.    The APA imposes a number of non-discretionary duties regarding rule-making procedures.  5 U.S.C. § 553.  Pursuant to the APA, the DOJ and BOP were required to provide advance notice of the 2019 Protocol, an opportunity for public comment, and an explanation of the rule ultimately adopted.  *See* 5 U.S.C. § 553(b) and (c).

134.    The DOJ and BOP failed to provide advance notice or opportunity for the public to comment on the 2019 Protocol prior to its promulgation.  The DOJ and BOP also failed to provide an explanation of why the 2019 Protocol was adopted.  In issuing the 2019 Protocol in contravention of such procedural requirements, the DOJ and BOP violated the APA.

135.    This violation of the APA will cause an injury to Lee's interest because, if the DOJ and BOP had complied with the procedural requirements described above, Lee could have addressed the multiple issues with the 2019 Protocol that have the substantial probability of resulting in cruel and unusual punishment.

136.    Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2).

## Count VIII
### (Violation of the APA — Agency Action That Is Arbitrary, Capricious, an Abuse of Discretion and Otherwise Not in Accordance with Law in Promulgating the 2019 Protocol)

137.    Lee realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

138.    Under the APA, a reviewing court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

139.    Agency action that is not the product of reasoned decision-making is arbitrary and capricious.  *Motor Vehicle Mfrs. Assn of United States, Inc. v. State Farm Mut. Auto Ins. Co.* 463 U.S. 29, 43 (1983).  To satisfy the requirement of reasoned decision-making, an agency must "cogently explain why it has exercised its discretion in a given manner."  *Id.* at 48.

140.    Despite the substantial changes to the 2008 Protocol that the 2019 Protocol seeks to effect, the DOJ and BOP offered <u>no</u> explanation for the 2019 Protocol.  The DOJ and BOP have utterly failed to explain the basis and reason(s) for their decision to adopt the 2019 Protocol or the specific procedures therein.  Such an explanation is even more important in this case given that, as alleged above, the 2019 Protocol is inconsistent with the 2008 Protocol in material ways (in addition to being contrary to the requirements of the FDPA).

141.    Thus, the adoption of the 2019 Protocol is arbitrary and capricious, in violation of the APA, because it was not the product of reasoned decision-making.

142.    This violation of the APA will cause an injury to Lee's interest because, if the DOJ and BOP had provided the required explanation of their decision-making, Lee would be able to identify any additional issues with the 2019 Protocol that have the substantial probability of resulting in cruel and unusual punishment.

143.     Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2).

**Count IX**
**(Violation of the APA — Arbitrary and Capricious**
**Failure to Exercise Enforcement Authority under the CSA)**

144.     Lee realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

145.     The CSA makes it unlawful to "dispense" any "controlled substance," 21 U.S.C. § 841(a)(1), except pursuant to a valid prescription "issued for a legitimate medical purpose" by a practitioner who is "acting in the usual course of professional practice" and registered pursuant to the statute.  21 U.S.C. §§ 802(21) and 829(e)(2).

146.     Pentobarbital is a Schedule II controlled substance.

147.     Regulations promulgated by the DEA provide that every person who "dispenses" a "controlled substance" is required to obtain a registration.  21 C.F.R. § 1301.11.  The regulations also provide that the DEA Administrator "shall deny" an application for registration unless the issuance of a registration is "required under the CSA.  21 C.F.R. § 1301.35.

148.     Upon information and belief, the 2019 Protocol calls for the dispensing of pentobarbital absent a valid prescription and by persons who lack a valid registration.  Moreover, Dhillon has arbitrarily and capriciously failed to exercise his authority to enforce the CSA by not requiring the persons who will dispense the pentobarbital to apply for a registration, and will continue to act arbitrarily and capriciously by permitting them to dispense the pentobarbital with doing so.

149.     Such arbitrary and capricious action violates the APA.

150.    This violation of the APA will cause an injury to Lee's interest because, as alleged above, an execution under the 2019 Protocol — with the use of pentobarbital in violation of the CSA — has the substantial probability of resulting in cruel and unusual punishment due to the properties of pentobarbital.

151.    Accordingly, the 2019 Protocol should be set aside pursuant to Section 706(2)(A) of the APA.

## VI.
## Prayer for Relief

WHEREFORE, in order to prevent the violations of the First, Fifth, Sixth and Eighth Amendments of the U.S. Constitution and the APA that are alleged above, Lee requests that the Court enter a judgment:

a.    declaring that the Defendants' actions, practices, customs, and policies with regard to their means, methods, procedures, and customs regarding executions, and specifically the 2019 Protocol, are illegal and violate the First, Fifth, Sixth and Eighth Amendments of the U.S. Constitution and the APA;

b.    vacating the 2019 Protocol and enjoining Defendants and all persons acting on their behalf from using the 2019 Protocol, or any revised protocol that violates Lee's rights and the law, for the same reasons challenged above;

c.    granting Lee his reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and the laws of the United States; and

d.    granting such further relief as the Court deems just and proper.

Dated:   August 23, 2019

Respectfully submitted,

HOGAN LOVELLS US LLP


*/s/       Elizabeth M. Hagerty*

Elizabeth M. Hagerty (Bar No. 1022774)
David S. Victorson (application for admission
forthcoming)
Alexandra Kolbe (application for admission
forthcoming)
Columbia Square
555 13th Street NW
Washington, DC  20004
(202) 637-5600
(202) 637-5910 (fax)
elizabeth.hagerty@hoganlovells.com
david.victorson@hoganlovells.com
alexandra.kolbe@hoganlovells.com

   and

Pieter Van Tol (*pro hac vice* application
to be filed)
Mallik Yamusah (*pro hac vice* application
to be filed)
390 Madison Avenue
New York, NY  10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com
mallik.yamusah@hoganlovells.com