*****Execution of Dustin Lee Honken Scheduled for January 15, 2020*****

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **IN THE MATTER OF THE FEDERAL BUREAU OF PRISONS' EXECUTION PROTOCOL CASES,** | ) | |
| **Lead case: *Roane et al. v. Barr et al.*** | ) | |
| | ) | **Case No. 19-mc-00145-TSC** |
| **THIS DOCUMENT RELATES TO:** | ) | |
| ***Lee & Honken v. Barr et al.*, No. 19-cv-2559** | ) | |

**PLAINTIFF DUSTIN LEE HONKEN'S *REDACTED* REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. The 2019 Protocol was enacted in violation of the APA' s notice-and-comment requirements.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. The 2019 Protocol is arbitrary and capricious. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

A. Defendants misstate the scope of the Court's review. . . . . . . . . . . . . . . . . . . . . . . . 9

1. The Court should consider the expert testimony and other extra-record evidence offered by Plaintiff in order to determine whether the Defendants have adequately considered and justified their chosen policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2. The protocol need not violate the Eighth Amendment in order to be arbitrary and capricious.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

3. Mr. Honken's claims attack Defendants' process. . . . . . . . . . . . . . . . . . . 15

B. Defendants have arbitrarily ignored the protections of the Food, Drug and Cosmetic Act and the Controlled Substances Act.. . . . . . . . . . . . . . . . . . . . . . 16

C. Defendants' use of pentobarbital is arbitrary and capricious.. . . . . . . . . . . . . . . . . 20

D. Defendants' use of a compounded drug is arbitrary and capricious. . . . . . . . . . . 22

III. The 2019 Protocol is contrary to the FDPA.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**TABLE OF AUTHORITIES**

**Cases**

*Am. Bus. Ass'n v. United States*, 627 F.2d 525 (D.C. Cir. 1980) . . . . . . . . . . 8

*Aulenback, Inc., v. Fed. Highway Admin.*, 103 F.3d 156 (D.C. Cir. 1997). . . . . . . . . . 2, 5, 6, 7

*Batterton v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980). . . . . . . . . . 3, 4, 6

*Beach Comms., Inc. v. FCC,* 959 F.2d 975 (D.C. Cir. 1992). . . . . . . . . . 10

*Beaty v. FDA*, 853 F. Supp. 2d 30 (D.D.C. 2012). . . . . . . . . . 16, 17

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019). . . . . . . . . . 20

*Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013). . . . . . . . . . 16

*Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360 (D.D.C. 2017). . . . . . . . . . 13

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1 (D.C. Cir. 2011). . . . . . . . . . 5, 6, 7

*Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989).. . . . . . . . . . 10, 13

*FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000). . . . . . . . . . 17

*Gerber v. Norton,* 294 F.3d 173 (D.C. Cir. 2002). . . . . . . . . . 11

*Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018). . . . . . . . . . 13

*Make the Road New York v. McAleenan*, ___ F. Supp. 3d ___, No. 19-CV-2369 (KBJ), 2019 WL 4738070 (D.D.C. Sept. 27, 2019). . . . . . . . . . 11, 12, 14, 22

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014).. . . . . . . . . . 3

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).. . . . . . . . . . 9, 15, 16, 18, 22

*Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d 150 (D.D.C. 2012).. . . . . . . . . . 12

*Nat'l Min, Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014). . . . . . . . . . 3, 4, 7

*Nat'l Sec. Counselors v. C.I.A.*, 931 F. Supp. 2d 77 (D.D.C. 2013). . . . . . . . . . 2, 3

*Oceana, Inc. v. Pritzker*, 126 F. Supp. 3d 110 (D.D.C. 2015).. . . . . . . . . . 10, 11, 12

*Oceana, Inc. v. Ross*, 275 F. Supp. 3d 270 (D.D.C. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Ohio Execution Protocol Litig.*, 937 F. 3d. 759 (6th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . 14

*Ringo v. Lombardi*, 706 F. Supp. 2d 952 (W.D. Mo. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Roane v. Holder*, 607 F. Supp. 2d 216 (D.D.C. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Syncor Int'l Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Theodore Roosevelt Conservation P'Ship v. Salazar*, 616 F.3d 497 (D.C. Cir. 2010). . . . . . . . . 11

*United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Kanner*, 603 F.3d 530 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Nazir*, 211 F. Supp. 2d 1372 (S.D. Fla. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Lovern*, 590 F.3d 1095 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Smith,* 573 F.3d 639 (8th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United Student Aid Funds, Inc., v. Devos*, 237 F. Supp. 3d 1 (D.D.C. 2017).. . . . . . . . . 10, 12, 13

*Zink v. Lombardi*, 783 F.3d 1089 (8th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Statutes and Court Rules**

5 U.S.C. § 551(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. § 706(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

5 U.S.C. § 706(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 3596(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

21 U.S.C. § 353b(a)(5).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

21 U.S.C. § 353b(d)(2)(A).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

21 U.S.C. § 353b(d)(2)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

21 U.S.C. § 802(27). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

21 U.S.C. § 829(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Civ. P. 30(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

Tex. Crim. Proc. Code § 43.14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**Regulations**

21 C.F.R. § 1306.04(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 C.F.R. § 26.3(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Other Authorities**

Stephen G. Breyer et al., *Administrative Law and Regulatory Policy: Problems, Text, and Cases* 985 (5th ed. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Deborah W. Denno, *Lethal Injection in Chaos Post-Baze*, 102 Geo. L.J. 1331 (2014).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Office of Legal Counsel, DOJ, “Whether the Food and Drug Administration Has Jurisdiction Over Articles Intended for Use in Lawful Executions,” (May 3, 2019), available at 2019 WL 2235666. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

## INTRODUCTION

Judicial review under the Administrative Procedure Act promotes "accountability and legislative supremacy." Stephen G. Breyer et al., *Administrative Law and Regulatory Policy: Problems, Text, and Cases* 985 (5th ed. 2002). The government threatens those objectives in its defense of the 2019 Protocol. Defendants urge that Mr. Honken has no rights or interests other than those guaranteed by the Eighth Amendment, and therefore, the protocol does not impose any "substantive burden" that would require notice-and-comment rulemaking. Opposition (ECF Doc. 36) at 3, 14. The Administrative Record irrevocably "establishes" that the protocol does not inflict cruel or unusual punishment, we are told, and thus, any other burdens neither require public participation nor permit judicial review for bureaucratic arbitrariness, *id.* at 14, 33-34, even though the protocol dictates the procedures by which government personnel will kill Mr. Honken and other condemned prisoners. By insisting that the Eighth Amendment is the sole measure of the protocol's legality, Defendants seek a categorical "capital punishment" exemption from the APA – an exemption that is solely Congress's to grant or deny.

The BOP of course lacks such an exemption. The Court should therefore set aside the 2019 Protocol because the Defendants enacted it without the procedures required by law, which is to say, notice-and-comment proceedings that are mandatory when, as here, the agency's statement is one of general applicability and future effect and which "implement[s] . . . [and] prescribe[s] law or policy." 5 U.S.C. § 551(4). The BOP's ill-considered protocol is additionally infirm because it is arbitrary and capricious: concerning themselves only with whether the protocol comports with the Eighth Amendment (itself a failed pursuit), the Defendants declined to gather and consider scientific evidence that contradicts their own views. As a result, they have placed Mr. Honken at a significant and well-documented risk of experiencing an excruciatingly painful death, all the while undermining the public's interest in responsive and accountable government. The Court should temporarily enjoin the 2019 Protocol.

## I. The 2019 Protocol Was Enacted in Violation of the APA's Notice-and-Comment Requirements.

Defendants argue that the 2019 Protocol is not subject to notice-and-comment requirements because it is a procedural rule that does not impose any "new substantive burdens." Opposition at 14 (quoting *Aulenback, Inc., v. Fed. Highway Admin.*, 103 F.3d 156, 169 (D.C. Cir. 1997)). The protocol carries no such burden, the Defendants continue, unless it independently violates the Eighth Amendment, because Plaintiff has no enforceable "right" to select the means of his death. *Id.* at 14-15. The unilaterally-assembled Administrative Record "establishes" that the 2019 Protocol does not violate the Eighth Amendment, Defendants insist, and therefore the protocol cannot be a substantive rule. *Id*. Defendants nowhere acknowledge any substantive burden other than a possible Eighth Amendment violation, nor do they acknowledge any other right, interest, or obligation affected by the 2019 Protocol.[1]

Mr. Honken agrees with Defendants that "a procedural rule does 'not impose new substantive burdens.'" Opposition at 12; *Aulenback*, 103 F.3d at 169. He disagrees, however, that an Eighth Amendment violation is the only possible substantive burden imposed by the 2019 Protocol. Indeed, the APA constrains agency action above and beyond constitutional limits. Defendants cite no precedent for their argument that the APA governs agency action only where there is an underlying constitutional violation. In fact, the cases Defendants cite explicitly recognize that "even where a rule does not adversely affect those interests ultimately at stake in the agency proceeding, it may still be subject to notice and comment if it intrudes upon other, important or fundamental rights or interests held by affected parties." *Nat'l Sec. Counselors v.*

[1] Lest there be any confusion on the point, Plaintiff challenges both the two-page lethal injection procedure that Defendants label an "addendum" to their broader execution protocol (ECF Doc. 29-2), as well as the broader protocol itself that appears on pages 1016-67 of the Administrative Record.

*C.I.A.*, 931 F. Supp. 2d 77, 112 (D.D.C. 2013) (internal quotation marks and citation omitted) (cited in Defendants' Opposition at 14). In *Mendoza v. Perez*, for example, the D.C. Circuit ruled that guidance letters promulgated by the Department of Labor were substantive rules subject to notice-and-comment requirements because they "meaningfully altered the rights and obligations of herders and their employers" by "alter[ing] the wages and working conditions H–2A employers are required to offer American sheepherders." 754 F.3d 1002, 1020 (D.C. Cir. 2014) (cited in Opposition at 12); *see also id.* at 1025 ("Because the [letters] change the regulatory scheme for herding operations, they are legislative rules."). Notably, wages and working conditions are not constitutional rights. Nevertheless, they constitute "rights and obligations of herders and their employers" affected by a "change [in] the regulatory scheme," thus requiring notice and comment. *Id.* at 1020, 1025.

In *Batterton v. Marshall*, cited by Defendants to define a "procedural rule," *see* Opposition at 12, the D.C. Circuit held that a modification to the Department of Labor's method of calculating unemployment statistics was *not* a procedural rule. *See* 648 F.2d 694, 696 (D.C. Cir. 1980). The court explained that the modification was substantive because it was "the agency's considered response to over a decade of serious criticism of its prior methodology" and "bears all the earmarks of conclusive agency action, governing the rights and interests of the public." *Id.* at 710. The "rights and interests of the public" at issue were, again, not grounded in a federal constitutional provision, but instead related to emergency allocations designed to curb the negative effects of unemployment. Yet these rights and interests were sufficient to trigger the notice-and-comment requirement.

By contrast, in *National Mining Association v. McCarthy*, the D.C. Circuit determined that certain "Final Guidance" issued by the Environmental Protection Agency was procedural rather than substantive because, "[a]s a legal matter, the Final Guidance is meaningless":

> As EPA acknowledged at oral argument, "The Guidance *has no legal impact*." Oral Arg. at 12:12. The Final Guidance does not tell regulated parties what they must do or may not do in order to avoid liability. The Final Guidance imposes no obligations or prohibitions on regulated entities. State permitting authorities are free to ignore it. The Final Guidance may not be the basis for an enforcement action against a regulated entity. Moreover, the Final Guidance may not be relied on by EPA as a defense in a proceeding challenging the denial of a permit. And the Final Guidance does not impose any requirements in order to obtain a permit or license. As a matter of law, state permitting authorities and permit applicants may ignore EPA's Final Guidance without facing any legal consequences.

758 F.3d 243, 252 (D.C. Cir. 2014) (internal quotation marks and citation omitted; emphasis added); *accord Aulenback*, 103 F.3d at 169 (ruling that Federal Highway Administration procedures for issuing out-of-service orders "do not impose new substantive burdens, in the sense that they either require or prohibit any particular actions on the part of motor carriers"). Thus, contrary to the government's argument, the notice-and-comment requirement gives way only where agency guidance "has no legal impact" or is substantively and practically "meaningless." *Nat'l Min. Assoc.*, 758 F.3d at 252. The government does not explain how the 2019 Protocol could meet that standard.

The 2019 Protocol is a substantive rule because it determines the rights and obligations of federally death-sentenced inmates and BOP personnel, and it imposes several substantive burdens on those it impacts. Condemned prisoners have an undeniable interest in how they will die, and in how they will spend their final days and minutes. *See In re Medley*, 134 U.S. 160, 171-72 (1890) (recognizing that a revised death penalty statute increased punishment by requiring solitary confinement before execution and by establishing various secrecy provisions). These interests are distinct from our federal constitutional right to be free from cruel and unusual punishment. Like the new wage methodology in *Batterton*, Mr. Honken and other condemned prisoners have "rights and interests" that are directly and substantially impacted by the 2019 Protocol. Indeed, each of Plaintiff's claims identifies specific rights and interests affected by the

protocol, even where those effects may not rise to the level of a constitutional violation. *See* Claims II-XI, Complaint (ECF Doc. 38) at 69-88.

Defendants' admissions confirm that the 2019 Protocol implicates much more than the Eighth Amendment. The protocol itself claims that the BOP will "ensure the execution of a person sentenced to death under federal law . . . be carried out in an efficient and humane manner." AR 1019. The accompanying record makes the same representations. AR 1, 3, 525-26, 871-72, 929, 931. Defendants' stated interest in "efficient and humane" executions, although surely related to the Eighth Amendment, is not developed *solely* based on the contours of that constitutional mandate. [redacted] Plaintiff agrees with the objective of diminishing pain as a relevant interest for all parties concerned.

Defendants' attempt to distinguish the D.C. Circuit's decision in *Electronic Privacy Information Center v. U.S. Department of Homeland Security* ("*EPIC*"), 653 F.3d 1 (D.C. Cir. 2011), rests primarily on the broad reach of the rule in that case. *See* Opposition at 14-16. But the D.C. Circuit has never suggested that the number of persons or percentage of the public impacted by a rule change determines whether it is subject to notice-and-comment procedures. To the contrary, the D.C. Circuit has observed that "substantial rights and interests . . . have come into

---

[2] Pursuant to the Court's protective order, *Roane* ECF Doc. 30, the exhibits containing deposition excerpts have been submitted separately and under seal. In addition, Plaintiff has, in the publicly-available ECF document reflecting this reply, redacted the portions that describe the deposition's contents.

play" even when those rights and interests belong only to highly specific classes of individuals and organizations, such as railroads, drug producers, motor carriers, and sheepherders. *Batterton*, 648 F.2d at 708.

Defendants also suggest that this case is "factually distinguishable" from *EPIC* because the 2019 Protocol is in some way superior to the previous protocol. *See* Opposition at 15-16 ("Moreover, whereas *EPIC* was focused on the fact that AIT was a greater privacy intrusion than the prior screening method (magnetometer), the government's choice of pentobarbital is an attempt to utilize a more humane method of execution than those preceding it. Thus, *EPIC* is factually distinguishable . . . ."). Defendants' subjective views regarding the virtue of the protocol have no bearing on whether the protocol is in fact legal, let alone whether it required public opportunity for notice and comment. The "essential purpose" of according notice-and-comment opportunities is "to reintroduce public participation and fairness to affected parties." *Batterton*, 648 F.2d at 703. Defendants would have the Court obliterate that purpose on the unproven assurance that the protocol is improved and comports with the Eighth Amendment, regardless of other public and private interests affected.

The D.C. Circuit made clear in *EPIC* that its decision was based neither on the broad reach of the rule, nor on a subjective assessment of the virtue of using AIT scanners rather than magnetometers. Instead, the D.C. Circuit's holding that the rule was substantive rested on the need to safeguard the APA's underlying policies:

> Of course, stated at a high enough level of generality, the new policy imposes no new substantive obligations upon airline passengers: The requirement that a passenger pass through a security checkpoint is hardly novel, the prohibition against boarding a plane with a weapon or an explosive device even less so. But this overly abstract account of the change in procedure at the checkpoint elides the privacy interests at the heart of the petitioners' concern with AIT. Despite the precautions taken by the TSA, it is clear that by producing an image of the unclothed passenger, an AIT scanner intrudes upon his or her personal privacy in a way a magnetometer does not. Therefore, regardless whether this is a "new substantive burden," *see Aulenback*, 103 F.3d at 169, the change substantively

> affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking.

*EPIC*, 653 F.3d at 6.

Here, too, the 2019 Protocol might impose "no new substantive obligations" if "stated at a high enough level of generality." *Id.* Mr. Honken agrees with Defendants that the 2019 Protocol "explain[s] how, in practice, BOP will carry out [executions], including the choice of lethal agent, the procedural steps of administering the lethal agent, and a whole host of other internal procedures." Opposition at 13 (citing AR 874-75, 1016-67). Just as in *EPIC*, the "requirement" that a federally death-sentenced inmate be executed by lethal injection "is hardly novel," and the imposition of a federal death sentence is "even less so. But this overly abstract account of the change in procedure at the [execution] elides the [fundamental] interests at the heart of the [plaintiffs'] concern with [the 2019 Protocol]." *EPIC*, 653 F.3d at 6. And "regardless whether this is a 'new substantive burden,' the change substantively affects [federally death-sentenced inmates and BOP officials] to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking." *Id.* (quoting *Aulenback*, 103 F.3d at 169).

Defendants' contention that "detail alone does not circumscribe the agency's discretion" (Opposition at 16) misses the salient point, which is that the 2019 Protocol is binding on all the parties it impacts. Federally death-sentenced prisoners and BOP officials alike must comply with the procedures outlined in the protocol. Although the 2019 Protocol leaves open the possibility that the BOP Director might make specific adjustments under unique circumstances, this circumscribed discretion hardly leaves the BOP Director – let alone Mr. Honken, any other condemned prisoner, or any employee of the BOP or DOJ – "free to ignore [the 2019 Protocol]." *Nat'l Min. Ass'n*, 758 F.3d at 252. [redacted]

[redacted]



More generally, as the D.C. Circuit has explained, "[a] matter of judgment is involved in distinguishing between rules, however discretionary in form, that effectively circumscribe administrative choice, and rules that contemplate that the administrator will exercise an informed discretion in the various cases that arise." *Am. Bus. Ass'n v. United States*, 627 F.2d 525, 529-30 (D.C. Cir. 1980) (internal quotation marks omitted). The 2019 Protocol falls into the former category. The protocol establishes unequivocally, for example, that all lethal injections shall be conducted with a single drug, pentobarbital; it does not allow the BOP Director to use his or her discretion to conduct executions using a different protocol or substance. The BOP Director cannot exercise discretion to decide that Mr. Honken or any other inmate will be executed using the three-drug protocol that was formerly in place. Thus, the 2019 Protocol, "however discretionary in form[,] . . . effectively circumscribes administrative choice." *Id.*

Finally, for largely the same reasons as detailed above, the Court should reject Defendants' alternative efforts to characterize the 2019 Protocol as either a general statement of policy or an interpretive rule. *See* Opposition at 17-19. The protocol fits neither exemption because it "*modifies* or *adds* to a legal norm based on the agency's *own authority*." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997) (emphases in original). Far from offering any type of extraneous clarification or optional guidance, the 2019 Protocol modifies the legal norm

for federal executions in order to render 28 C.F.R. § 26.3(a)(4) legally operative. The DOJ has recognized this fact publicly, announcing that the 2019 Protocol "clear[s] the way for the federal government to resume capital punishment after a nearly two decade lapse." Press Release, *Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse*, <<https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse>>. Because the issuance of the 2019 Protocol is necessary in order for the BOP to ensure the legal validity of 28 C.F.R. § 26.3(a)(4)'s requirement that an inmate be executed via lethal injection, the protocol is a substantive rule requiring notice-and-comment procedures.

## II. The 2019 Protocol Is Arbitrary and Capricious.

The government fares no better defending the rationality of the 2019 Protocol. Defendants misapprehend the scope of APA review for arbitrary and capricious agency action, as well as the numerous reasons why their protocol is arbitrary and capricious.

### A. Defendants Misstate the Scope of the Court's Review.

Seeking to limit the Court's review of the 2019 Protocol for arbitrariness and capriciousness, Defendants make three critical errors. First, they wish to limit all inquiries to the four corners of the Administrative Record, which would confine the Court to the matters considered by the agency in determining which matters are important enough to require the agency's consideration – in other words, when deciding whether the BOP has failed to consider "an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), the only aspects that count are those which appear in the BOP's record. Second, Defendants import Eighth Amendment standards into every APA inquiry and erroneously conclude that the BOP's policy is rational as long as it does not inflict cruel and unusual punishment. Third, Defendants repeatedly mischaracterize Mr. Honken's claims as substantive – that is, as a claim that the BOP should follow policy A instead of policy B or

believe scientist X over scientist Y – when instead, the issue is that Defendants have failed, as a procedural matter, to consider the adverse consequences of their protocol even as the protocol itself purports to "ensure" a "humane" execution. AR 1019. Defendants are wrong in all three respects.

**1. The Court should consider the expert testimony and other extra-record evidence offered by Plaintiff in order to determine whether the Defendants have adequately considered and justified their chosen policy.**

Defendants repeatedly complain that Mr. Honken brings extra-record evidence to support his APA claims. *See* Opposition at 2, 29-30 (in general), 33 (concerning pentobarbital), 37 (concerning compounded drugs), 41 (concerning IV procedures). Although Defendants are correct that courts ordinarily confine their review to the Administrative Record in APA cases, Opposition at 29-30, courts have long recognized that "it may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective," *Beach Comms., Inc. v. FCC*, 959 F.2d 975, 987 (D.C. Cir. 1992), including when "the procedural validity of the [agency's] action . . . remains in serious question." *United Student Aid Funds, Inc., v. Devos*, 237 F. Supp. 3d 1, 3 (D.D.C. 2017) (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)). That is the case here because Defendants have failed to undertake notice-and-comment procedures and have otherwise failed to explain their key policy choices. *See* Memorandum in Support of Motion for Preliminary Injunction (ECF Doc. 29), at 8-34.

Defendants overlook the reason that courts generally limit review to the administrative record, through which interested parties have *already* been heard. "The rarity with which consideration of extra-record evidence occurs stems in part from the fact that challengers . . . typically have the opportunity to submit such evidence in conjunction with comments on proposed agency action." *Oceana, Inc. v. Pritzker*, 126 F. Supp. 3d 110, 113 (D.D.C. 2015). Had the government provided an opportunity for notice and comment, Plaintiff would have submitted his experts' reports and substantive arguments to BOP for its consideration. The Administrative

Record would then reflect the documented concerns of the near-certain prospect of acute pulmonary edema, the excruciating suffering that Plaintiff would experience while still conscious, the hazards of compounded drugs, and the need for specific procedures to limit the hazards of botched IV placements and maladministration of the execution drug. The BOP would then consider that evidence and address the concerns raised by it. *See id.* (allowing consideration of extra-record evidence because "Dr. Weaver's declaration features exactly the sort of commentary that parties typically submit to an agency before its action is finalized"); *accord Gerber v. Norton*, 294 F.3d 173, 182-84 (D.C. Cir. 2002) (considering declarations and other evidence of the plaintiffs' proposed comments when an agency violated the ESA and APA by failing to disclose crucial information until after the comment period had closed); *cf. Theodore Roosevelt Conservation P'Ship v. Salazar*, 616 F.3d 497, 515 (D.C. Cir. 2010) (cited in Defendants' Opposition at 29) ("The district court was entirely within its discretion . . . to conclude it was unnecessary to let Appellants introduce evidence in court that they had never sought to introduce to the agency.").

In *Make the Road New York v. McAleenan* – a challenge to new Department of Homeland Security expedited removal rules – this Court recently considered "supporting declarations" and other evidence adduced by the plaintiffs when considering whether the new rules were arbitrary and capricious. 2019 WL 4738070 at *29, *34 (D.D.C. Sept. 27, 2019). Informed by the plaintiffs' declarations, the Court observed that DHS's previous removal regime was itself highly problematic for persons living within the country and subject to removal, and therefore, the agency's failure to *consider* those problems was arbitrary and capricious because the new rule would necessarily multiply them. *See id.* at *36 ("At the very least, it would seem that some consideration of how many people might be erroneously swept up in the expanded expedited-removal dragnet, and/or how often such identification errors have occurred with respect to the agency's expedited-removal practices in the past, would be in order if the agency endeavors to

undertake a rational consideration of whether to ramp up the practice."). The agency similarly failed to consider the "real-world consequences" of expanding the set of long-time U.S. residents who would suddenly become subject to immediate removal, including consequences for the communities of those involved. *Id.* at *37. The plaintiffs' extra-record materials documented those consequences, which is what enabled the Court to determine that "that factor matters" and that DHS wrongly failed to consider it:

> [T]he agency's apparent failure to evaluate the impact of the policy on the individuals who would be subject to the New Designation, and their communities, means that it has ignored a significant aspect of the problem that its proposed policy creates—i.e., the fact that the greatly expanded category of individuals who would be newly subject to expedited removal might have ties to the community that individuals arriving at ports-of-entry, or those who are found within 100 miles of a border and who have not been in the United States for at least two weeks, generally do not.

*Id.* at *38.

*Make the Road* exemplifies courts' duty to consider extra-record evidence that demonstrates the agency's failure to "examine all relevant factors" in making its decision. *Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d 150, 156 (D.D.C. 2012); *see, e.g.*, *Oceana*, 126 F. Supp. 3d at 113 (considering extra-record declaration because agency did not adequately explain its chosen methodology); *United Student Aid Funds*, 237 F. Supp. 3d at 5-6 (considering extra-record evidence where Department of Education's new limits on charging defaulted borrowers for collection costs did not reflect awareness of loan guaranty industry practice or industry's reliance on earlier policy); *accord Make the Road*, 2019 WL 4738070 at *39 ("[I]t is the very definition of arbitrariness in rulemaking if an agency refuses to acknowledge (*or fails to obtain*) the facts and figures that matter prior to exercising its discretion to promulgate a rule.") (emphasis added).

Review under the APA would be impossible if courts lacked such authority. An agency could determine *its* view of which factors to consider, assemble a record relating only to those

factors, proclaim its policy to be non-arbitrary on the basis of that record, and then prohibit consideration of any other materials that might inform the choice of which factors to consider in the first place, as happened here: "The Administrative Record establishes that pentobarbital is a humane method of execution, and Honken's contrary view does not displace the agency's reasoned judgment on this score." Opposition at 14. That is precisely why courts allow extra-record evidence to enable meaningful judicial review. *Esch*, 876 F.2d at 991; *United Student Aid Funds*, 237 F. Supp. 3d at 3.

Moreover, consideration of materials outside the Administrative Record is appropriate "in cases where relief is at issue." *Esch*, 876 F.2d at 991. In particular, when a party requests injunctive relief, "it will often be necessary for a court to take new evidence to fully evaluate claims of irreparable harm and claims that the issuance of the injunction is in the public interest." *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 369 n.7 (D.D.C. 2017) (internal quotation marks and citation omitted) (considering declarations outside of the administrative record in evaluating whether to grant an injunction); *see also Grace v. Whitaker*, 344 F. Supp. 3d 96, 114 (D.D.C. 2018) (granting a motion to consider extra-record evidence, including declarations and country reports, for purposes of considering plaintiffs' motion for a preliminary injunction of a new policy governing asylum applications). Because Mr. Honken seeks a preliminary injunction, the Court should consider all evidence relevant to whether such relief should issue.

**2. The protocol need not violate the Eighth Amendment in order to be arbitrary and capricious.**

Time and again, Defendants assess the rationality of their protocol under the Eighth Amendment instead of the APA. *See* Opposition at 30-31 (in general), 31-36 (concerning pentobarbital), 36-38 (concerning compounded drugs), 41-43 (concerning IV placement). Defendants argue, for example, that whatever the complexities of APA review in all manner of

technical cases, the federal courts should not serve as "boards of inquiry" to evaluate execution methods (a principle of Eighth Amendment jurisprudence, as well as federalism), that courts have repeatedly upheld the use of compounded pentobarbital against claims that its administration amounts to cruel and unusual punishment (another Eighth Amendment principle), and that courts have tolerated the risk of IV mishaps (under the Eighth Amendment). Defendants even suggest that they are free to inflict any constitutionally-permissible amount of pain that *they* consider tolerable as they pursue the objective of "efficient and effective operations." Opposition at 12, 33-34. Even a well-proven and near-certain danger that Mr. Honken will drown to death from acute pulmonary edema is not "constitutionally problematic" in Defendants' view, and so Defendants claim that the APA does not require them to even *consider* that danger when formulating their policy. *Id.* at 34 (quoting *In re Ohio Execution Protocol Litig.*, 937 F. 3d. 759, 762 (6th Cir. 2019)).

As with their proposed blanket exception to notice-and-comment procedures, *see* Section I, *supra*, Defendants seek a startling and counter-statutory exemption from the APA's prohibition on arbitrary and capricious agency action. They cite no authority for the premise that the Eighth Amendment alone measures the protocol's rationality under the APA, and indeed, no case supports the notion that, when an agency's policy risks human suffering, the consequence is irrelevant as long it is constitutional. To the contrary, "[A]n administrative agency that just plows ahead and announces a new rule, without taking the reasonably foreseeable potential negative impacts of the policy determination into account . . . might as well have picked its policy out of a hat." *Make the Road*, 2019 WL 4738070 at *39; *accord Oceana, Inc. v. Ross*, 275 F. Supp. 3d 270, 295 (D.D.C. 2017) (purpose of review for arbitrariness and capricious under the APA and National Environmental Protection Act is to "ensur[e] that no *arguably significant* consequences have been ignored") (emphasis added; quotation omitted).

Regardless of whether agencies must as a general rule consider and diminish the human suffering that they would otherwise cause, that consideration is expressly relevant under the Defendants' policy and its accompanying record. Defendants claim to have pursued a "humane" execution method, and they consulted medical experts in order to develop one. *See* AR 1, 3, 871-72, 929, 931. The protocol itself embodies a policy of "ensur[ing]" that an execution will be carried out in "an efficient and humane manner." AR 1019. [redacted] Given these important concerns, the foreseeable risk that condemned prisoners will experience pain caused by hazardous compounded drugs, a sensation of drowning while conscious, or a botched IV placement is necessarily an "important aspect of the problem," *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43, which requires the BOP to at least consider a foreseeable risk of pain even when the Eighth Amendment may tolerate that same risk.

**3. Mr. Honken's claims attack Defendants' process.**

Defendants recast Mr. Honken's procedural claims as substantive ones. Plaintiff repeatedly urges that the BOP must consider additional evidence, address unmentioned legal constraints, and explain its decisions, only for Defendants to insist that they need not believe Plaintiffs' experts over their own or codify Plaintiffs' suggestions within their written protocol. *See* Opposition at 30 (arguing that Plaintiff offers expert declarations "solely to support his disagreement with the agency's decision"), 33 (describing "Honken's [supposed] argument that the APA imposes an additional burden on the agency to ensure that an execution is free from all pain"), 41 (arguing that "Honken has no entitlement to dictate" issues of IV placement).

Defendants' straw-man arguments are unhelpful. Mr. Honken does not contend that the APA requires the Defendants' to agree with him and adopt his suggestions. Rather, he urges that the Court apply to the 2019 Protocol the same standard that it would apply when reviewing any other agency decision for arbitrariness and capriciousness: the protocol must be set aside if "the

agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or reached a decision that "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. The BOP must consider the foreseeable risks and implications of the policies it enacts, and the Court should enforce that modest obligation.

### B. Defendants Have Arbitrarily Ignored the Protections of the Food, Drug and Cosmetic Act and the Controlled Substances Act.

In urging that the FDCA simply does not apply to execution drugs, Defendants rely on the Office of Legal Counsel's memorandum instead of the authorities that bind this Court: *Beaty v. FDA*, 853 F. Supp. 2d 30 (D.D.C. 2012), and *Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013). *See* Opposition at 25-28. Citing the OLC memorandum, Defendants insist that execution drugs do not serve a "medical purpose," and that Defendants seek to inject Plaintiff with pentobarbital in order to execute him instead of treating him. *Id.* at 25-28, 31. They go on to argue that it is impossible for Defendants to obtain a medical prescription for execution drugs because no physician will issue one, and therefore, complying with the FDCA (and the CSA) would "nullify" the endeavor of killing Mr. Honken. *Id.* at 24-25, 27, 31.

The government is wrong on all counts. First, Defendants do not even acknowledge this Court's ruling in *Beaty*, which explained not only that the FDCA applies to execution drugs, but also that the statute helps to ensure that such drugs accomplish the pain-diminishing purpose for which the executioners have selected them:

> In *Beaty v. FDA*, the U.S. District Court for the District of Columbia ultimately banned the importation of sodium thiopental, finding that the drug did not follow FDA regulations and exposed plaintiffs "to the risk that the drug will not function as intended"; therefore, plaintiffs were able to show "at least a 'modest' increment of risk that the use of foreign thiopental in their executions would result in conscious suffocation, pain, and cardiac arrest."

AR 777 (Deborah W. Denno, *Lethal Injection in Chaos Post-Baze*, 102 Geo. L.J. 1331, 1361

(2014), quoting *Beaty*, 853 F. Supp. 2d at 32, 37, 41-43).

Defendants' attempt to distinguish *Cook* is unpersuasive. Defendants argue that *Cook* concerns whether the FDA had discretion to allow importation of an unapproved and misbranded drug, and not the "broader question of the scope of the FDCA's reach." Opposition at 28. But the "broader question" posed by Defendants is whether an execution drug is exempt from the FDCA simply because it is an execution drug. *See* OLC Memo (AR 963) ("We conclude that articles intended for use in capital punishment by a State or the federal government cannot be regulated as 'drugs' or 'devices' under the FDCA."). This Court definitively answered that question in the negative in *Beaty*, and the D.C. Circuit affirmed in *Cook*. It makes no difference that the FDCA importation provision in *Cook* required the agency to take an enforcement action, and that the provisions invoked by Plaintiff carry a measure of prosecutorial discretion. Plaintiff's claim is that the Defendants themselves are violating the statute through a particular means of execution. *See Roane v. Holder*, 607 F. Supp. 2d 216, 227 (D.D.C. 2009). Regardless of which FDCA subsection the Defendants are violating, *Beaty* and *Cook* defeat their argument for a death penalty carve-out from the entire statute.

Defendants relatedly urge that pentobarbital lacks a therapeutic purpose – Opposition at 26-27, 31 – but the fact is that Defendants *selected* pentobarbital rather than other death-causing drugs, and by their own documents, they made that selection for the medical purpose of diminishing pain and in consultation with numerous medical professionals. *See* AR 1, 3, 871-72, 929, 931. Defendants' position is hopelessly and arbitrarily inconsistent: they invoke medical science in order to show that their protocol is "humane," but they disclaim a medical purpose in order to avoid the safeguards that govern medical science – including the ones that ensure a "drug" is "safe and effective for its intended use." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). The government cannot have it both ways. "Where the Eighth Amendment requires protocols that include adequate safeguards against unnecessary

pain . . . and superior courts have indicated that the involvement of medical professionals and rules for administration enhances such safeguards, the safeguards provided by the CSA and FDCA are not irrelevant." *Ringo v. Lombardi*, 706 F. Supp. 2d 952, 962 (W.D. Mo. 2010). The protocol's adherence to the FDCA and CSA is an "important aspect of the problem." *State Farm*, 463 U.S. at 43. Indeed, the BOP protocol claims to make "every effort . . . to ensure the execution process . . . [f]aithfully adheres to the letter and intent of the law." AR 1019-20.

Equally meritless is the Defendants' bald assertion that no physician would *ever* prescribe an execution drug, because medical ethics forbid it. *See* Opposition at 24-25, 27, 31. Defendants do not document any attempts to obtain such a prescription, let alone prove that those attempts would be futile. More importantly, the Defendants' argument is disproven by the experience of Missouri and Georgia – two of the five states whose execution methods the Defendants claim as models. *See* AR 7-91. Missouri's execution team includes the individuals who "prescribe . . . the chemicals for use in the lethal injection procedure." AR 70. The Administrative Record shows that such prescriptions were in fact issued. *See* AR 254 (*Zink v. Lombardi*, 783 F.3d 1089, 1096 (8th Cir. 2015) (noting that "the district court ordered the State to disclose to counsel for the prisoners the identities of the physician who prescribes the pentobarbital used in Missouri executions, the pharmacist who compounds it, and the laboratory that tests the compounded drug")). Georgia issues medical prescriptions as well. *See* Rose Scott, *Georgia Department of Corrections Using Compounding Pharmacy for Execution Drug* (Jul. 11, 2013), available at <<https://www.wabe.org/georgia-department-corrections-using-compounding-pharmacy-execution-drug/>> (describing prescription for pentobarbital for execution of Warren Hill).

The point is not that Missouri and Georgia have obtained CSA- and FDCA-compliant prescriptions that reflect a physician's examination of the prisoner and individualized medical judgment. *See* Ex. 2 (Missouri prescription for prisoner Joseph Franklin); *see also* Bill Rankin,

*The Secrets of the Death Penalty,* Atlanta Journal-Constitution (Oct. 24, 2015), available at <<https://www.ajc.com/news/local/the-secrets-the-death-penalty/4MGsZNIPtwg0h9Mg1yolpO/>> (noting that the prescribing physician does not practice medicine). The point is instead that ethical restrictions do not so sweepingly "*preclude* physicians from issuing prescriptions that would result in death." Opposition at 24 (emphasis added). The requirement of a legally valid prescription would not "nullify" the enterprise of executing prisoners, *id.* at 31, but would only require that a medical professional make a clinical judgment that a particular drug is best suited to diminish the risk of pain for a particular prisoner, and then a personal willingness to issue such a prescription. *See* 21 C.F.R. § 1306.04(a); *United States v. Nazir*, 211 F. Supp. 2d 1372, 1375 (S.D. Fla. 2002) (requirements for a valid prescription). If Defendants are unable to obtain such a prescription, the problem is their choice of execution drug—not the constraints of medical ethics.

Defendants separately resist applying the CSA to their conduct, but again their arguments fail. They urge that the protocol does not involve "dispensing" a controlled substance because the prisoner is not an "ultimate user" of the drug under 21 U.S.C. § 829(a). Opposition at 23. Mr. Honken will not "obtain or possess the pentobarbital for his own use," the argument goes, and so the drug cannot be "dispensed" to him. *Id.* (quoting 21 U.S.C. § 802(27)). But that argument is nothing more than a re-packaging of Defendants' broader contention that execution drugs do not serve a medical purpose for the prisoner's benefit, i.e., "use." A prisoner is administered pentobarbital (as opposed to some other lethal drug) "for his own use" just as a mental patient might be involuntarily injected with an anti-psychotic medication for his or her "use." In both instances the drug is for the injectee's "use" in the sense that a medical judgment has been made that the choice of a particular drug, from among a set of several options, best serves a clinical purpose for the injectee. Defendants' reading of the law would allow the involuntary injecting of any controlled substance to take place without a prescription.

Neither is it true that the CSA is solely concerned with recreational drug abuse as opposed to drug safety. *See* Opposition at 23-24. For example, the government has successfully prosecuted "internet pharmacy" operators who threaten patient safety by issuing prescriptions without a medical examination, and thus, outside the scope of accepted medical practice. *See, e.g.*, *United States v. Kanner*, 603 F.3d 530, 533-35 (8th Cir. 2010); *United States v. Smith*, 573 F.3d 639, 643-44, 647-48 (8th Cir. 2008); *United States v. Lovern*, 590 F.3d 1095, 1097-1100 (10th Cir. 2009).

**C. Defendants' Use of Pentobarbital Is Arbitrary and Capricious.**

As explained above, Defendants wrongly employ the Eighth Amendment as the sole measure of their execution drug, and even then, they wrongly restrict that measure to the government-retrieved evidence that supports the agency's chosen drug. *See* Section II.A.1-2, *supra*. But the government's defense fails even on its own misguided terms. Invoking *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019), Defendants urge that the holding "necessarily" and unalterably means "that pentobarbital is not very likely to cause an unconstitutional level of pain." Opposition at 31. But *Bucklew* means no such thing: its holding reflects the record that the particular parties made, and more importantly, the claims they asserted on that record. The losing claim in *Bucklew* was not that a 5-gram dose of pentobarbital would cause a horrific death, but rather, that Mr. Bucklew's unique medical problems made it reasonably certain that *he* would suffer such a death if injected with pentobarbital. *Bucklew*, 139 S. Ct. at 1118. Mr. Bucklew even conceded that "the State's lethal injection protocol is constitutional in most applications." *Id.*

Mr. Honken concedes no such thing, and of course, neither does anesthesiologist Gail Van Norman, M.D., who explains that that the protocol creates a "virtual medical certainty that most, if not all, prisoners will experience excruciating suffering, including sensations of drowning and suffocation, as a result of this effect of IV injection of 5 grams of pentobarbital." ECF Doc. 29-1 at 7. Dr. Van Norman explains that a short-acting barbiturate diminishes the

subject's *responsiveness* as opposed to *consciousness*, and thus, a person injected with such a large dose will consciously experience the flash pulmonary edema that ensues. *Id.* The Defendants' chosen anesthesiologist, Dr. Antognini, does not seem to acknowledge the comparatively recent science described by Dr. Van Norman, or the scientific studies she describes that evaluate the effects of short-acting barbiturates on the subject's awareness (as opposed to responsiveness). *Id.* at 7, 13-29. "[T]raditional textbooks and authors report that the inhibitory effects of barbiturates cause 'unconsciousness,'" explains Dr. Van Norman. *Id.* at 13. But "authoritative publications now describe barbiturates as producing 'unresponsiveness,' since how, and even whether, they affect consciousness is under serious question." *Id.* Not having engaged that question by compiling an objective record, Defendants now declare that the record itself precludes such a debate: "The Administrative Record *establishes* that pentobarbital is a humane method of execution," we are told. Opposition at 14 (emphasis added). But it "establishes" no such thing, even by the government's *ipse dixit*.

Apparently unsatisfied by the Administrative Record, Defendants rely on Dr. Antognini's testimony from an Ohio case. *See* Opposition at 33. Dr. Antognini states that pulmonary edema "is a common finding in drug overdose." *Id.* at 33. To that insight Defendants add their own gloss that an "overdose" is their chosen means of execution. *Id.* But not all overdoses are the same. Unlike the everyday drug-overdose deaths that Dr. Antognini described, the "overdose" that Defendants plan to administer is massive in size – so much so that the magnitude of the dose itself is what causes "flash" or acute pulmonary edema, as opposed to cardiogenic pulmonary edema in which fluid backs up in the lungs as the secondary result of heart failure (itself the result of brain sedation). *See* ECF Doc. 29-1 (Van Norman Declaration) at 7; ECF Doc. 29-3 (Edgar Declaration) at 3, 19-20. Dr. Van Norman explains that "flash pulmonary edema occurs *virtually immediately* during and after high-dose barbiturate injection, and well within a time frame before peak drug effects on the brain have occurred." ECF Doc. 29-1 at 36 (emphasis

added). The prompt "respiratory arrest" that Dr. Antognini infers from witness accounts of executions – *see* Opposition at 34 – is itself inconsistent with the autopsy results described by Dr. Edgar. *See* ECF Doc. 29-3 at 21. "The presence of fulminant pulmonary edema at autopsy is evidence that inmates are continuing to breathe while fluid leaks into their lungs, a finding which would not be expected if pentobarbital rapidly produced respiratory arrest." *Id.* Defendants must at least acknowledge and consider the conflicting evidence before declaring that it irrevocably "establishes" anything. *See Make the Road New York*, 2019 WL 4738070 at *36 ("[A]n agency cannot consider *only* the perceived shiny bright spots of a policy that it is mulling.") (emphasis in original).

**D. Defendants' Use of a Compounded Drug Is Arbitrary and Capricious.**

Aside from their misguided importation of Eighth Amendment standards – *see* Section II.A., above – Defendants *still* fail to justify their claimed need to use a compounded drug. Defendants label Plaintiff's argument "frivolous," and they believe it "undisputed" that FDA-approved pentobarbital is unavailable for executions. Opposition at 36. But it is disputed. Plaintiff's complaint alleges that the State of Missouri obtained and used non-compounded pentobarbital in executions. *See* ECF Doc. 38 at 65 (¶ 157). That allegation is not Plaintiff's alone. *See* Chris McDaniel, *Missouri Execution Drug Purchases Revealed*, Buzzfeed News (January 8, 2017), available at <<https://www.buzzfeednews.com/article/chrismcdaniel/missouri-execution-drug-purchases-revealed>> ("A sealed court document obtained by BuzzFeed News shows that the state had, at least sometimes in the past six years, bought manufactured pentobarbital – as opposed to the compounded version of the drug inmates spent years fighting over in court – for use in its executions."). Defendants have not proven that FDA-approved drugs are unavailable, or even that they made meaningful efforts to obtain them. The BOP, then, has not "cogently explain[ed] why it has exercised its discretion in a given manner." S*tate Farm*, 463 U.S. at 43.

Defendants nevertheless assure the Court that nothing is wrong with their compounded drugs or the Section 503B pharmacy that issues them – Opposition at 39-40 – but their arguments raise more questions than they answer. First, Defendants explain that the API manufacturer's "initial" batch of the pentobarbital powder failed quality testing, which led the provider to "refine its production process." *Id.* at 39. But the nature of this "refinement," and the problem that gave rise to it, are not specified by Defendants or the extra-record declaration on which they rely. *Id.* Second, the Defendants' Section 503B pharmacy – whose status as such is nowhere mentioned in the Administrative Record – is quite obviously not operating like one. The pharmacy's compounded drug is "essentially a copy" of FDA-approved pentobarbital – and the drug is not modified in a manner that makes a "clinical difference" in an individual case. *See* 21 U.S.C. §§ 353b(a)(5), (d)(2)(A)-(B). Third, regardless of which pharmacy is compounding the drugs, Defendants do not answer Dr. Almgren's concern that the pentobarbital will be expired and sub-potent at the time of execution. *See* Motion for Preliminary Injunction (ECF Doc. 29), at 30.

## III.   <u>The 2019 Protocol is Contrary to the FDPA.</u>

A court must set aside an agency's action when it is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 706(2)(A), (C). Plaintiff's motion explains that the 2019 Protocol violates the FDPA. The FDPA, in turn, requires that a death sentence be carried out "in the manner prescribed by the law of the State in which the sentence is imposed," unless that state does not provide for the death penalty, in which case the sentencing court must designate another state in which the execution will take place "in the manner prescribed" by that state's law. 18 U.S.C. § 3596(a). Plaintiff was sentenced in the non-capital state of Iowa, and the court ordered that he be executed in accordance with Indiana law. Rather than follow Indiana's method of execution, the Defendants have announced a single procedure to carry out *all* federal death sentences, regardless of where

they were imposed or on what judicial orders. *See* Plaintiff's Memorandum of Points and Authorities (ECF Doc. 29) at 34-39.

Defendants cite *United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005), in support of their one-size-fits-all execution procedure. *See* Opposition at 21-22. The Fifth Circuit in *Bourgeois* held that the sentencing court in Texas did not violate the FDPA when it ordered that Mr. Bourgeois be executed by lethal injection at a place and with lethal chemicals to be determined by the BOP and the Attorney General. *See* 423 F.3d at 509. But nothing in *Bourgeois* suggests that the BOP would ultimately choose an execution method that conflicts with the one required by Texas law, which provides for lethal injection under the "*procedure to be determined and supervised by the Director of the institutional division of the Texas Department of Criminal Justice*." *Id.* (quoting Tex. Crim. Proc. Code § 43.14) (emphasis added). Mr. Bourgeois did not demonstrate that the district court's order was inconsistent with Texas law, at least by the bare fact of allowing BOP to decide the place and method of his execution. *See Bourgeois*, 423 F.3d at 509. At no point did the Fifth Circuit endorse the Defendants' sweeping position here, which is that their protocol conforms with the law of *every* death penalty state simply because all such states use lethal injection. That argument fails for the reasons already explained. *See* Plaintiff's Memorandum (ECF Doc. 29), at 34-39.

Neither is there merit in Defendants' attempt to sever from their regulations the language that purports to authorize lethal injection for all federal executions. *See* Opposition at 20. Defendants argue that their execution protocol would be the same even if the enabling regulations in 28 C.F.R. Part 26 were to adopt the FDPA's later-enacted language that a federal death sentence must be carried out "in the manner prescribed by the law of the State in which the sentence is imposed." *Id.* (quoting 18 U.S.C. § 3596(a)). But that change would not sanitize the 2019 Protocol in the slightest. It would still leave a uniform execution method for all federal cases, as well as a means of lethal injection that conflicts with the Indiana method that governs

Plaintiff's execution by court order. *See United States v. Honken*, N.D. Iowa Case No. 3:01-cr-3047, Judgment, Doc. No. 702-2 at 3. Whatever authority the Defendants invoke, it does not authorize the protocol they adopted.

## CONCLUSION

Wherefore, for all the foregoing reasons and those previously urged, the Court should grant a preliminary injunction in favor of Plaintiff-Intervenor Dustin Lee Honken, so as to enjoin Defendants from carrying out the scheduled execution of Mr. Honken under the 2019 Protocol on January 15, 2020, or at any other time until further order of this Court.

Dated: 11/18/2019

Respectfully Submitted,

/s/ Jon Jeffress

Jon Jeffress
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
Telephone - 202-640-2850
Email - jjeffress@kaiserdillon.com

Timothy Kane, Assistant Federal Defender
Shawn Nolan, Chief, Capital Habeas Unit
Federal Community Defender Office, E.D. Pa.
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone - 215-928-0520
Email – timothy_kane@fd.org
Email – shawn_nolan@fd.org

*Counsel for Plaintiff-Intervenor Dustin Lee Honken*

**CERTIFICATE OF SERVICE**

I certify that on November 18, 2019, true and correct copies of the foregoing reply, together with the exhibits accompanying it, were filed using the CM/ECF system, which will then send notification of such filing to all counsel of record.

/s/ Jon Jeffress

Jon Jeffress
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
Telephone - 202-640-2850
Email - jjeffress@kaiserdillon.com

*Counsel for Plaintiff-Intervenor Dustin Lee Honken*